STATE OF NEBRASKA, APPELLEE, V. GARY M. HOLMBERG,
APPELLANT.

231 N. W. 2d 672

Filed July 17, 1975.   No. 39930.

John O. Sennett of McGinley, Lane, Mueller, Shana-
han, McQuillan & Gale, for appellant.

Paul L. Douglas, Attorney General, and Chauncey C.
Sheldon, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

SPENCER, J.

Defendant appeals his convictions for possession of marijuana with the intent to distribute, deliver, or dispense; for the possession of amphetamines; and for the possession of cocaine. While the defendant sets out five assignments of error, they may be categorized as embraced within the ambit of the overruling of defendant's motion to suppress for an alleged unreasonable search and seizure. The issue in this case was previously decided adverse to the defendant in an opinion by a single member of this court. We affirm.

Defendant was operating a motor vehicle, a camper on a pickup, in the early morning hours of Saturday, November 24, 1973. He was proceeding in an easterly direction on Interstate 80 in Keith County, Nebraska. Trooper Hollis Compton of the Nebraska Safety Patrol, while in his official uniform, stopped defendant's vehicle for the purpose of checking his operator's license, the vehicle registration, and the vehicle identification number. There was no other reason for the stop. Reliance to make the stop is based solely upon section 60-435, R. R. S. 1943, which provides in part as follows: "* * * all members of the Nebraska State Patrol * * * shall have the power * * * (4) when in uniform, to require the driver thereof to stop and exhibit his operator's license and registration card issued for the vehicle and submit to an inspection of such vehicle, the registration plates and registration cards thereon * * *."

While checking the license and registration, the officer smelled a distinctive marijuana odor and observed what he believed to be marijuana seeds on the floor of the vehicle. Incense was burning in the vehicle. He asked the defendant if he had any marijuana and the defendant said "No." Defendant then told the officer he had been smoking his last marijuana cigarette. The trooper asked permission to look into the camper. The

defendant gave consent, obtained the key, and unlocked the camper. When the door was opened there was a very strong odor which the trooper associated with the smell of raw marijuana. In inspecting the camper, he noticed the floor had built-up sides and that there was a box on the side. The built-up portion on the sides of the box contained some screws. The trooper asked defendant what the sides contained and defendant said all he knew was insulation. The trooper asked defendant if he could look in those portions of the box. Defendant did not reply. The trooper obtained a screwdriver and while the defendant held the trooper's flashlight the trooper unscrewed the screws on the box. When the trooper pulled the sides open, he could see green plastic bags. Each bag was approximately 2 and ½ inches thick, approximately 6 to 8 inches wide, and approximately 14 to 16 inches long. There were 42 packages of marijuana in the green bags; each weighed 2 pounds apiece, for a total weight of 84 pounds. When the trooper saw the green bags, he placed defendant under arrest and read him the Miranda warnings. He then took defendant into Ogallala where he conducted a strip search and put defendant in jail. The strip search disclosed a substance containing dielamphetamine and substances containing cocaine.

The next day, Sunday, a specialized criminal investigator for the Patrol visited with the defendant. After the defendant signed a "right's waiver" form the investigator questioned him. Defendant told this investigator he did not have a prescription for the amphetamines. He had obtained them from a girl who did, and had obtained them for the purpose of staying awake on the trip. Defendant said the white powder in the yellow plastic vial found in his possession was an amphetamine he had been "snorting." He also admitted that the cigarette and the other marijuana had been in his possession.

The problem presented is whether or not the evidence

obtained by the search at the scene and later at the station should be suppressed because the initial stop to check the operator's license and vehicle registration constituted an unreasonable seizure within the ambit of the Fourth Amendment. We hold it should not. The stop made was a lawful one under section 60-435, R. R. S. 1943.

It is defendant's contention that even the momentary stopping of a motorist for an inspection constitutes an arrest and requires probable cause. He argues his freedom of movement should be immune from state interference unless there is some indication of a law violation. What we said in State v. Carpenter (1967), 181 Neb. 639, 150 N. W. 2d 129, is pertinent herein: "Defendant is laboring under the misapprehension that the same rule on probable cause applies when a person is merely stopped and questioned as when he is arrested. Defendant's approach presents a clash of interest between the protection of the public and right of an individual. His premise is false and would cripple law enforcement. * * * Individual rights on occasion must give way to the rights of society. This is the very purpose of law—to restrict the rights of the individual to provide protection for society."

Defendant argues that section 60-435, R. R. S. 1943, would be unconstitutional unless we can read into it a requirement of some reasonable cause otherwise for stopping a motor vehicle. We do not construe the statute that narrowly. This statute is intended to give the officers mentioned therein the power to enforce laws regulating the operation of vehicles or the use of the highways. The licensing laws are safety measures applicable to the use of all roads or highways within the state. It would be most unusual to have an observable indication of a licensing violation of a moving vehicle. Stopping the vehicle for inspection is the only practical method of enforcement of section 60-435, R. R. S. 1943.

Defendant is relying on Commonwealth v. Swanger,

a 1973 Pennsylvania case, 220 Pa. Super. 720, 300 A. 2d 66, rehearing at 453 Pa. 107, 307 A. 2d 875, which held an investigatory stop was unreasonable and arbitrary. It held the Pennsylvania statute constitutional, but determined that the officer only had authority to stop a vehicle to check a registration and license when he had probable cause based on specific facts which indicated to him either the vehicle or the driver was in violation of the code. To so hold would emasculate the intent and purpose of the statute.

There are cases in some jurisdictions which hold that because of the number of automobiles on the highways and their extensive use by our population, any stop to spot-check license and registration is manifestly unjust and unfair unless all automobiles using the highways at that place and time are likewise checked. While the record herein would indicate that the defendant and the trooper were apparently the only two persons using the highway at that early hour of the morning, we do not accept the rationale of these cases. We are in agreement with the many decisions in other jurisdictions which hold otherwise.

The only practical method of enforcing the licensing laws involved is by stopping the vehicle. The inconvenience experienced by the individual motorist is relatively slight compared to the benefits to be derived from strict enforcement of our licensing laws. Whether this should be accomplished by spot checks or road blocks is a question that has been raised. Certainly there is less inconvenience to the motoring public by using spot checks. Spot checks also have the advantage of always being unexpectedly possible. We believe occasional spot checks are not only more practical but can have a salutary effect in the enforcement of our traffic laws and serve to promote the safety of the traveling public. Excessive spot checks can be unduly burdensome to traffic and commerce. The line of demarcation between the two is not easily drawn. However, due regard for

the practical necessities of effective driver and vehicle licensing enforcement requires a brief stop or detention for checking purposes. It is a matter of balancing between the governmental interest in the safety of users of the highways and the individual's right to freedom and privacy.

The District of Columbia Court of Appeals in Palmore v. United States (1972), 290 A. 2d 573, upheld procedure similar to that followed in this instance. Two District of Columbia officers in an unmarked car, recognizing that the car the defendant was driving was a rental car, decided to run a spot check to determine if the defendant had a proper license and a rental agreement (equivalent of proper registration). Defendant had committed no traffic offense and his auto had no apparent equipment defect. The stop was solely to check the operator's license and the vehicle registration. During the stop, one of the officers noted the presence of a trigger mechanism of a pistol protruding out from beneath the arm rest on the front seat of defendant's car. He removed the pistol and after learning it was unregistered, placed the defendant under arrest. The narrow issue posed in that case was whether the officers could stop the defendant and demand his license and registration when they had not seen defendant violate a traffic or vehicular equipment regulation and had no cause to believe that he was about to engage in any criminal activity. The government argued that the right to stop was a duty mandated by Congress. The officers had a right to require the driver to produce his license and vehicle registration without the need of first having reasonable suspicion that the driver lacked those particular documents. The following from that case is pertinent herein: "At the outset, we reject the rigid rule which appellant urges us to adopt: That a police officer may stop an automobile for a spot check of the driver's license and car registration *only* when he has articulable suspicion as defined by *Terry,* that either of such docu-

ments is invalid. The touchstone of the fourth amendment is reasonableness. It seems to us in this age of the motor car that when the community's interest in limiting use of its highways to licensed drivers in registered autos is balanced against the momentary interruption of the motorist which is necessary to ascertain whether he is complying with these licensing requirements such intrusion is *not* so unreasonable as to be violative of the fourth amendment.

"We must keep in mind that if we were to limit the police as appellant urges, to stopping *only* those autos in which the driver might reasonably be suspected to be without a license, for example, because of his youthful appearance, the results would unjustifiably single out and discriminate against certain groups of citizens, i. e., the young. Moreover, such a restrictive ruling by us might render virtually unenforceable the Congressional prohibition against *all* unlicensed drivers and unregistered cars driving on District of Columbia streets. After all, persons who drive in the District without a valid license and registration will not necessarily exhibit conduct or the appearance giving rise to articulable suspicion that they are without proper driving credentials. Thus, they would be immune from the 'spot check' to enforce a requirement deemed necessary by Congress for public safety on the District's highways."

The Court of Criminal Appeals of Texas, in Leonard v. State (1973), 496 S. W. 2d 576, held to the same effect. There, an officer stopped a station wagon for the purpose of making a driver's license check. "The officer asked to see Leonard's 'driver's license.' Leonard said he did not have one, but offered other identification. The officer, when asked if he noticed anything about Leonard's appearance, replied: 'Yes, sir; from an odor from his clothing it was a marijuana smell.' The officer then testified: 'I proceeded over to the vehicle that I had stopped and I stuck my head into—to look at the

passenger and ask him for identification. That is when I smelled the real strong odor of marijuana * * *.' "

The Texas court held the officer was authorized to stop Leonard's vehicle by virtue of the statute to determine whether the driver had a valid license to operate the vehicle. It held the State had a legitimate interest to determine the fitness of a vehicle to be used and its driver to operate such vehicle on a public road. The court said: "The momentary stopping of a citizen for this purpose does not violate constitutional rights. See Myricks v. United States, (370 F. 2d 901 (5th Cir., 1967))." Quoting further from Leonard v. State, *supra,* the court said: "Similar statutory provisions have been construed by many courts in the same manner as Article 6687b, Sec. 13, V.A.T.C.S. has been construed by this court. See, e. g., United States v. Lepinski, 460 F. 2d 234 (10th Cir. 1972); United States v. Croft, 429 F. 2d 884 (10th Cir. 1970); Lipton v. United States, 348 F. 2d 591 (9th Cir. 1965); United States v. Ware, 457 F. 2d 828 (7th Cir. 1972); Palmore v. United States, D. C. App., 290 A. 2d 573 (1972); and State v. Garcia, 16 N. C. App. 344, 192 S. E. 2d 2 (1972)."

In United States v. Turner (8th Cir., 1971), 442 F. 2d 1146, Judge Lay wrote: "The police officer clearly had probable cause to arrest the defendant for failure to have a proper driver's license under Missiouri law. It is argued, however, that the officer's motive in stopping defendant's car was not to check his driver's license, but merely to pursue his suspicion of some other crime. Thus, it is contended that the officer wanted to make an unwarranted search for evidence of some unidentified crime. We do not find it unreasonable for an officer to inquire as to a driver's license under these circumstances. It is conceded under the state law of Missouri that an officer has a right to stop an automobile to make a routine check for an operator's license. See Jackson v. United States, 408 F. 2d 1165, 1168 (8 Cir. 1969); Rodgers v. United States, 362 F. 2d 358, 362 (8

Cir. 1966). Cf. Terry v. Ohio, 392 U. S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); Carpenter v. Sigler, 419 F. 2d 169 (8 Cir. 1969)."

In Rodgers v. United States (8th Cir., 1966), 362 F. 2d 358, in an opinion by Mr. Justice Blackmun, then a member of the Eighth Circuit, the court held a routine license check and its concomitant temporary delay of a driver does not constitute an arrest in a legal sense where there is nothing arbitrary or harassing present. Three Missouri patrol officers had received a radio broadcast on a number of stolen vehicles, including a white Buick convertible. When the defendant passed one of the officers he was violating no traffic regulation but the officer noticed he was driving a white Buick convertible similar to the car previously reported stolen. The trooper stopped the car and asked to see the driver's license of defendant. The defendant replied he did not have it with him, that he had left it in St. Louis. The trooper then detained the defendant and subsequently learned that the car had been stolen.

In Lipton v. United States (9th Cir., 1965), 348 F. 2d 591, the Ninth Circuit held if stopping a motorist for the sole purpose of inquiring whether he held a California license was in any sense a seizure, it was not an unreasonable one and did not violate any right given the motorist by the Fourth Amendment to the federal Constitution.

In Myricks v. United States (5th Cir., 1967), 370 F. 2d 901, appellant Myricks was stopped for a routine driver's license check and had none. It subsequently developed the car was stolen. The Fifth Circuit, in an opinion by Circuit Judge Brown, there said: "The Constitution is, it is often said, a living document. If it lives, it must take account of the dominant symbol of today's dynamic society. It must recognize, therefore, that Texas has a legitimate interest in the roadworthiness of automobiles which transport, but which can maim and kill. Cf. Ford Motor Co. v. Mathis, 5 Cir., 1963, 322 F.

2d 267, 3 A. L. R. 3d 1002.  This comprehends both technical fitness of the driver and the mechanical fitness of the machine.  After the event it is always too late. The State can practice preventative therapy by reasonable road checks to ascertain whether man and machine meet the legislative determination of fitness.  That this requires a momentary stopping of the traveling citizen is not fatal.  Nor is it because the inspection may produce the irrefutable proof that the law has just been violated.  The purpose of the check is to determine the present, not the past:  *is* the car, *is* the driver now fit for further driving?  In the accommodation of society's needs to the basic right of citizens to be free from disruption of unrestricted travel by police officers stopping cars in the hopes of uncovering the evidence of non-traffic crimes, cf. Brinegar v. United States, 1949, 338 U. S. 160, 69 S. Ct. 1302, 93 L. Ed. 1879; Clay v. United States, 5 Cir., 1956, 239 F. 2d 196; Clay v. United States, 5 Cir., 1957, 246 F. 2d 298, cert. denied, 355 U. S. 863, 78 S. Ct. 96, 2 L. Ed. 2d 69; Rios v. United States, 1960, 364 U. S. 353, 80 S. Ct. 1431, 4 L. Ed. 2d 1688, the stopping for road checks is reasonable and therefore acceptable.  Likewise, an arrest is proper if the check reveals a current violation which by its nature must have been taking place in the immediate past.  State and Federal Courts, including this one, have uniformly sustained such checks and arrests when not done as a subterfuge or ruse."

We are not unmindful of the possibility of abuse of the statute as we interpret it.  We have no hesitancy in saying that if the facts should disclose that the stop is a mere pretext for other reasons, it would be held to be arbitrary and unreasonable and violative of the Fourth Amendment.  We hasten to state, specifically and emphatically, that a spot check is not to be used as a pretext to search for evidence of some possible crime unrelated to the requirements of section 60-435, R. R. S. 1943.  We hold further that when the driver has pro-

duced his licenses and they are in proper form, he must be promptly allowed to continue on his way. It is only when, as here, the officer becomes aware of a reasonable probability of a law violation that the driver may be detained for further questioning.

As the trial court found, the only reason for the stop was to check the operator's license of the defendant, the motor vehicle registration, and its identification number. This is permissible under our law. No constitutional violation was involved. Subsequent to the stop, by the use of his senses, the trooper became aware of the presence of marijuana. At that time, under our law, he had probable cause to search the camper for marijuana without the necessity of relying on consent, although he had consent in this case. In the search he discovered the marijuana and placed the defendant under arrest. Subsequently, a search at the police station disclosed the presence of amphetamines and cocaine. It would be mere conjecture to speculate on what might have happened if the defendant had continued to "snort" the white powder for the more than 300 miles of further travel across Nebraska.

As suggested by the dissent, this opinion was written prior to the release of United States v. Brignoni-Ponce, 43 Law Week 5028, (June 24, 1975), 422 U. S. 873, 95 S. Ct. 2574, 45 L. Ed. 2d 607. It has been reaffirmed subsequent to that decision upon the ground that footnote 8 limits that case to Border Patrol agents, and specifically excepts the situation present herein. Footnote 8 is as follows: "Our decision in this case takes into account the special function of the Border Patrol, the importance of the governmental interests in policing the border area, the character of roving-patrol stops, and the availability of alternatives to random stops unsupported by reasonable suspicion. *Border Patrol agents have no part in enforcing laws that regulate highway use, and their activities have nothing to do with an inquiry whether motorists and their vehicles are en-*

*titled, by virtue of compliance with laws governing highway usage, to be upon the public highways. Our decision thus does not imply that state and local enforcement agencies are without power to conduct such limited stops as are necessary to enforce laws regarding driver's licenses, vehicle registration, truck weights, and similar matters."* (Italics supplied.)

We also note that the dissent is in error in suggesting that of the cases cited in this opinion only that of Palmore v. United States, 290 A. 2d 573, on its facts supports the conclusion we reach.

The judgment of the trial court is affirmed.

AFFIRMED.

McCOWN, J., dissenting.

The majority opinion, on the strength of section 60-435, R. R. S. 1943, now holds that a law enforcement officer, when in uniform, may stop any motorist at random at any time and at any place on the public highways, streets, or roads of the State of Nebraska without any articulable reason to suspect that he has violated any law, but simply for the avowed purpose of checking his operator's license and vehicle registration. That holding emasculates the constitutional protection of the Fourth Amendment guaranties against unreasonable search and seizure and for all practical purposes repeals the Fourth Amendment by statutory fiat. The mere pronouncement of the magic words "I wanted to check the registration and driver's license" becomes the "open sesame" which removes all constitutional barriers to a random investigative stop of any motor vehicle at any time, any place, at the arbitrary whim of any police officer.

In the case at bar the officer's reason to make the stop was solely to check the operator's license, vehicle registration, and identification number. He had no other reason and there were no facts or circumstances which would justify any reasonable suspicion of the violation of any law. The majority opinion relies upon cases

which are cited as holding that a police officer may stop an automobile for a spot check of driver's license and car registration without any articulable suspicion that any law is being violated, or that either of such documents is invalid. Of the cases cited only that of Palmore v. United States, 290 A. 2d 573, on its facts supports such a conclusion. That case rests its holding that such a seizure is reasonable on the ground that the community has an interest in limiting the use of its highways to licensed drivers in registered automobiles. The community has an even greater interest in protecting itself against far more serious crimes but such a justification has not previously been sufficient to override the mandates of the Fourth Amendment.

On the other hand, many more cases, indirectly referred to in the majority opinion, have held such an investigatory stop to be unreasonable and arbitrary when there is no articulable reason to suspect a violation of any law. Such cases are not only more numerous, but far more persuasive. See, for example, Commonwealth v. Swanger, 453 Pa. 107, 307 A. 2d 875 (1973). In that case a statute also granted the right to stop a vehicle for the purpose of inspection in even broader terms than the Nebraska statute. The Pennsylvania court specifically held that the right of an individual to be free from government intrusions without apparent reason outweighed the interest of the public in insuring safety on the highways. The Pennsylvania court said: "The crux of our decision that a stop of a single vehicle is unreasonable where there is no outward sign the vehicle or the operator are in violation of the Motor Vehicle Code, goes to the Commonwealth's argument the police need no justification to stop the vehicle. We rule before the government may single out one automobile to stop, there must be specific facts justifying this intrusion. To hold otherwise would be to give the police absolute, unreviewable discretion and authority to intrude into an individual's life for no cause whatsoever."

The Nebraska statute itself has been previously interpreted by the United States District Court for Nebraska to mean that there must be some founded grounds which draw or attract the attention of an officer to a possible violation of law. See United States v. Bell, 383 F. Supp. 1298 (D.C. Neb., 1974). Although the United States court in that case deferred from ruling on the constitutionality of section 60-435, R. R. S. 1943, pending a determination of the issue by this court en banc, the court did say: "This Court, in considering future cases, will narrowly construe such a statute to the extent that there must be a founded and reasonable suspicion drawing an officer's attention in order for him to pursue a selective stop which infringes, intrudes, or molests an individual's expectation of privacy guaranteed under the Fourth Amendment." The United States District Court also said: "It is intolerable and unreasonable to allow or authorize a police officer to stop any vehicle on a pretext or in a selective manner through the utilization of a state driver's license statute or motor vehicle registration or safety statute, on the chance that such officer might perceive illegal activity; such an inconvenience and indignity is not outweighed by an overriding governmental interest." It should be noted here that that case involved the same Officer Compton who is involved in this case.

No matter what views may be held on the subject of whether or not a motorist can be stopped at random for investigation of his driver's license and registration without any reason to suspect that he has violated any law, the issue was foreclosed by the United States Supreme Court on June 30, 1975, in the case of United States v. Brignoni-Ponce, 43 Law Week 5028 (June 24, 1975). 422 U. S. 873, 95 S. Ct. 2574, 45 L. Ed. 2d 607. Syllabus (b) of that case specifically holds: "To allow roving patrols the broad and unlimited discretion urged by the Government to stop all vehicles in the border area without any reason to suspect that they

have violated any law, would not be 'reasonable' under the Fourth Amendment."

That case involved a roving patrol stop of an automobile by the border patrol to question the occupants about their citizenship and immigration status. The stop was at a point approximately 65 miles north of the Mexican border. The only reason for stopping the automobile was that its three occupants appeared to be of Mexican descent. The stopping of cars without warrants in the particular area was authorized under federal statutes and current regulations of the border patrol. The United States Supreme Court reaffirmed the principle that no act of Congress can authorize a violation of the Constitution, and that an investigative stop that involves only a brief detention short of traditional arrest constitutes a seizure which must be "reasonable." "As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."

The Supreme Court held that because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop and the absence of practical alternatives for policing the border, that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke the suspicion. The court specifically reiterated that the stop and inquiry must be "reasonably related in scope to the justification for their initiation."

It seems patently clear that the thrust of the Supreme Court opinion is directed at random stops of a single vehicle which are made without any reason to suspect that the motorist has violated any law. The court said: "To approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular

vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers. * * * Thus, if we approved the Government's position in this case, Border Patrol officers could stop motorists at random for questioning, day or night, anywhere within 100 air miles of the 2,000-mile border, on a city street, a busy highway, or a desert road, without any reason to suspect that they have violated any law.

"We are not convinced that the legitimate needs of law enforcement require this degree of interference with lawful traffic."

The majority opinion of this court was written prior to the release of the Brignoni-Ponce case but has been reaffirmed subsequent to that decision upon the ground that footnote 8 in Brignoni-Ponce states: "Our decision thus does not imply that state and local enforcement agencies are without power to conduct such limited stops as are necessary to enforce laws regarding driver's licenses, vehicle registration, truck weights, and similar matters."

It seems only logical that the type of investigative stop referred to in that footnote is a fixed point or checkpoint stop and not an indiscriminate random stop of a single vehicle without reasonable suspicion. The concurrence of Mr. Justice Rehnquist and the concurrence of Mr. Justice White, with whom Mr. Justice Blackmun joins, confirm that conclusion.

There is simply no logical definitive way to distinguish between the stop of an automobile made for the purpose of determining whether driver's license and vehicular registration laws have been violated, and a stop to determine whether the laws governing entry and transportation of aliens have been violated. If any distinction can be made, it might be said that the governmental interest and the public interest in the enforcement of

alien entry laws is greater than interest in the proper registration and licensing of vehicles and drivers.

As the Supreme Court said in Brignoni-Ponce with respect to seizures of the person involving only a brief detention short of traditional arrest, "the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." It seems transparently clear that an indiscriminate random stop of a single motor vehicle without any ground for reasonable suspicion of any law violation, which can be made at the whim of any law officer, is an arbitrary interference with an individual's right to personal security and is unreasonable within the ambit of the Fourth Amendment. The initial seizure here being unconstitutional, the motion to suppress should have been granted.