STATE OF NEBRASKA, APPELLEE, V. JOHN F.
KRETCHMAR, APPELLANT.

267 N. W. 2d 740

Filed July 5, 1978. No. 41730.

John P. McCluskey, Julius Lucius Echeles, and
Laurence J. Bolon, for appellant.

Paul L. Douglas, Attorney General, and Chauncey
C. Sheldon, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH,
McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

SPENCER, J.

Defendant appeals his convictions for possession
of marijuana weighing more than 1 pound; posses-
sion of marijuana with intent to manufacture, dis-
tribute, deliver, or dispense; and possession of co-
caine. He was sentenced to probation for a period of
2 years with the last 90 days to be spent in county
jail, and fined $2,000. He assigns as error the over-
ruling of his motion to suppress evidence seized
from his vehicle, and the consideration of his failure

to explain his possession in determining he possessed it with intent to deliver.

The facts are not in dispute. An officer of the Nebraska State Patrol, while traveling west on Interstate 80 in York County, observed defendant driving a late-model automobile in the eastbound lane. His initial reaction was that the driver might be an illegal alien and that the car possibly had been stolen. He decided to check its registration. He turned his patrol car around on the median and pursued the vehicle. When he pulled alongside the vehicle, still believing the car might be stolen, he turned on the red lights on the patrol car and pulled the defendant, John F. Kretchmar, over to the side of the road.

After stopping at the side of the road, defendant walked back toward the patrol car. The officer met defendant between the two vehicles and asked to see his operator's license. Defendant appeared nervous and had difficulty locating the license in his billfold. He eventually produced the license and the officer then requested to see the vehicle registration. Defendant stated the car was rented and he had the rental papers in the vehicle.

The officer followed defendant to the car and stood by the open door on the driver's side while defendant retrieved the papers from the glove compartment. The officer detected the odor of marijuana. He looked inside the vehicle and observed what appeared to be a tire covered by a blanket behind the driver's seat on the floor, and on the rear seat there were suitcases, clothing, and a cooler.

After examining the rental papers the officer performed an equipment check on the vehicle. He then informed the defendant he smelled marijuana and desired to search the trunk. Defendant refused to consent to the search. The trooper took the keys from defendant's hand and proceeded to unlock the trunk. Defendant grabbed the trooper's hand in an attempt to prevent him from opening the trunk. The

trunk was opened and the trooper observed it was filled with what he believed to be marijuana in brick form. Defendant, who was placed under arrest, was transported to the York County sheriff's office.

Defendant's vehicle was also towed to the sheriff's office where the trooper removed a suitcase belonging to the defendant. Inside he found a leather or vinyl pouch with a metal container enclosed. The contents of the container were later analyzed as cocaine. An inventory search of the vehicle also revealed cocaine in a pocket of a jacket lying on the front seat. Removed from the trunk were 238 kilos of marijuana weighing approximately 460 pounds.

The stop in this case resulted from an intuitive feeling on the part of the trooper that the driver of the vehicle did not fit the late model vehicle he was driving, and that a check should be made to ascertain whether or not the vehicle might possibly have been stolen. The officer testified he stopped the car for the express purpose "of checking him out, getting his driver's license and registration."

Section 60-435, R. R. S. 1943, permits an officer in uniform to require the driver of an automobile to stop and exhibit his driver's license and the registration card issued for the vehicle. The stop was within the ambit of that statute, which has been upheld in State v. Holmberg, 194 Neb. 337, 231 N. W. 2d 672 (1975), and State v. Shepardson, 194 Neb. 673, 235 N. W. 2d 218 (1975).

In Holmberg we said: "A routine license check and its concomitant temporary delay of a driver does not constitute an arrest in a legal sense where there is nothing arbitrary or harassing present."

Subsequent to the stop, by the use of his senses the trooper became aware of the presence of marijuana. A trained officer should have no difficulty in smelling 460 pounds of marijuana. At that time, under our law, the officer had probable cause to search the

automobile for marijuana without the necessity of relying on consent.

Defendant seeks to distinguish Holmberg and Shepardson on the theory that section 60-435, R. R. S. 1943, permits the stop of a moving vehicle only for the limited purpose of enforcing the traffic safety laws. Section 60-435, R. R. S. 1943, reads, so far as material here: "The superintendent and all members of the Nebraska State Patrol and all other peace officers mentioned in section 39-6,192 shall have the power (1) of peace officers for the purpose of enforcing the provisions of this act and for the purpose of enforcing any other law regulating the operation of vehicles or the use of the highways; * * *." We would consider the stop herein to be within the ambit of this provision.

The stopping of Kretchmar for the purpose of checking his driver's license and the certificate of registration for the car he was driving, if it may be construed to be a seizure, was not in any sense an unreasonable one. It did not violate any right given Kretchmar by the Fourth Amendment to the federal Constitution. Lipton v. United States (9th Cir., 1965), 348 F. 2d 591; State v. Holmberg, 194 Neb. 337, 231 N. W. 2d 672 (1975).

The fact that a law enforcement officer may entertain a suspicion that a certain motor vehicle may be stolen does not vitiate the lawfulness of a random spot check of the vehicle registration and operator's license of the driver pursuant to section 60-435, R. R. S. 1943. There is a direct relationship between the stop and the purposes authorized by the statute. The fact that the officer may have a suspicion the vehicle is stolen does not disqualify him from conducting an otherwise lawful section 60-435, R. R. S. 1943, check.

When the officer became aware that the car contained marijuana he had probable cause to arrest the defendant and to search the vehicle. Chambers

v. Maroney, 399 U. S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970). In that case, the occupants of the car were arrested and the car was driven to the police station where it was searched. The United States Supreme Court said: "On the facts before us, the blue station wagon could have been searched on the spot when it was stopped since there was probable cause to search and it was a fleeting target for a search. The probable-cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained." The United States Supreme Court held, for constitutional purposes, it saw no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

The instant case is readily distinguishable from State v. Colgrove, 198 Neb. 319, 253 N. W. 2d 20 (1977). There, this court held the car was stopped to serve warrants, not for the purpose of checking the operator's license and car registration. As soon as the car was stopped, the officers realized that the two individuals they were seeking were not in the vehicle. In the present case, the car was stopped for the specific purpose of checking the operator's license and the car registration.

This case is similar to State v. Shepardson, 194 Neb. 673, 235 N. W. 2d 218 (1975). There, the officer decided to make a spot check for proper vehicle and registration papers because the defendant did not seem to fit the vehicle and the thought occurred to

him that the vehicle might be stolen. On the question at issue herein, this case is controlled by Shepardson.

This case was tried to the court without a jury. Preliminary to the imposition of sentence, the court summarized the evidence in a general way and at one point stated: "No evidence was offered by the defendant that he did not know of the existence of the marijuana or the cocaine nor was any explanation offered as a reason for the quantity." The court then proceeded to make certain findings of fact, the final one of which was: "Four, that the failure of the defendant to otherwise explain his possession of this large quantity of marijuana, which was processed and packaged in a form customarily used for distribution, supports a conclusion and finding beyond a reasonable doubt of the possession with intent to distribute."

Defendant argues that the aforementioned comments by the trial court constitute a violation of the fundamental principles that a defendant is entitled to a presumption of innocence and his failure to testify shall not create any presumption against him. The fallacy in defendant's assignment of error lies in the fact that he apparently misconceives the meaning of the trial court's remarks.

The court was not commenting as such on the failure of the defendant to testify. The court was simply commenting on the complete lack of any evidence of an exculpatory nature — whether through testimony of the defendant or otherwise — to mitigate against the natural and logical evidentiary presumption that the defendant was in possession of marijuana with intent to distribute. The comment was on the lack of evidence, not the lack of defendant presenting himself as a witness.

There is nothing in the remarks from the bench which justifies a conclusion that the trial judge considered the failure of the defendant to testify as in it-

self constituting or taking the place of evidence of guilt. It is obvious that the undisputed and unrebutted evidence of guilt on the issue of intent was so overwhelming as to be totally inconsistent with any other finding.

There is no merit to defendant's assignments of errors. The judgment should be and hereby is affirmed.

AFFIRMED.

WHITE, C. THOMAS, J., dissenting.

The United States Supreme Court has held the word automobile is not a talisman in whose presence the Fourth Amendment fades away and disappears. See, Coolidge v. New Hampshire, 403 U. S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564. In United States v. Brignoni-Ponce, 422 U. S. 873, 95 S. Ct. 2574, 45 L. Ed. 2d 607, the Supreme Court held the stop of an automobile for even a brief period of time constitutes a "seizure" within the meaning of the Fourth Amendment. The court went on to criticize random stops by the Border Patrol not based on a reasonable suspicion. While the Supreme Court has not ruled on the specific issue of whether random stops by state patrolmen to check documents are constitutionally valid, the principles enunciated in Brignoni-Ponce clearly suggest that they are not. The majority persists in ignoring the language of the Supreme Court and the weight of authority by relying on State v. Holmberg, 194 Neb. 337, 231 N. W. 2d 672.

It is not necessary to again detail the authority contrary to the majority position except to mention cases decided since Holmberg whose language we feel is germane to the issue. Authority contrary to the majority's opinion existing prior to Holmberg was set out in the dissent of McCown, J., in State v. Holmberg, *supra.*

It is to be noted that even authority relied on by the majority in Holmberg is now doubtful. In Holmberg, the majority discussed two cases from the

Eighth Circuit Court of Appeals to support its position, United States v. Turner (8th Cir., 1971), 442 F. 2d 1146, and Rodgers v. United States (8th Cir., 1966), 362 F. 2d 358. Language found in United States v. Harris (8th Cir., 1975), 528 F. 2d 1327, plainly makes adherence to a rule allowing random stops of automobiles in the Eighth Circuit questionable. After stating that detention of an automobile by police is a seizure for Fourth Amendment purposes, the court in Harris said: "It is well settled in justifying such an intrusion, a police officer '* * * *must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'* " (Emphasis supplied.) Another case utilized by the majority in Holmberg, Lipton v. United States (9th Cir., 1965), 348 F. 2d 591, was limited by the holding in United States v. Carrizoza-Gaxiola (9th Cir., 1975), 523 F. 2d 239. Carrizoza-Gaxiola held that a warrantless stop which was part of an effort to detect stolen vehicles cannot be justified under the guise of a check for compliance with state licensing and registration requirements.

In two recent cases, courts considered the Holmberg rule and rejected it. See, United States v. Montgomery (D. C., 1977), 561 F. 2d 875; State v. Prouse (Del., 1978), 382 A. 2d 1359. In State v. Prouse, *supra,* the Delaware Supreme Court, in holding random stops inherently arbitrary, reasoned: "However, the factor which in our opinion makes random stops, absent justifying facts, unreasonable is the inherent arbitrariness of the procedure. The flaw in the process is that absolute discretion and authority is conferred upon the police to detain whomever they desire for whatever reason on the pretense of a documents check stop. Thus an officer prejudiced against any visibly identifiable group could stop a disproportionate number of persons in the group. No discrimination has been

shown in the stop under examination here, but the evil of the possibility of discriminatory stops does exist. If we were to accept the State's position, discriminatory stopping procedures could be practiced with little or no chance for judicial review.''

Citing Terry v. Ohio, 392 U. S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889, the Eighth Circuit Court of Appeals in United States v. Harris, *supra,* held that a reasonable suspicion standard was to be applied in random automobile stops.

The majority here would equate intuition with reasonable suspicion. Intuition is not reasonable suspicion, but rather selective suspicion. Selective suspicion, without more, is merely a mask for personal prejudices. The following testimony of the officer illustrates the inherently arbitrary nature of random stops: ''Q. Tell me what specific facts led you to believe that the motor vehicle was stolen?

''A. The reason — there were no specific facts. I did not have a report saying that this vehicle was stolen. I did not know that this vehicle was stolen. I just felt that the driver of the vehicle did not fit the vehicle and I had an inkling, call it what you want, but I felt at the time that the vehicle could possibly be stolen.

''Q. All right. Tell me what facts gave you the feeling that —.

''A. Okay, I will do the best I can.

''Q. Well, I hope so.

''A. When I first observed the vehicle eastbound I saw that the driver at this time looked to be like a Mexican male driving a newer model Chevrolet and in my line of work people, or a car, if it is going to be stolen for various reasons a lot of times it is a newer model car, rather than an older model car, whether it be for profit, if you are going to steal a car, a lot of people will steal it so that they can make some money off it, or if they are going to steal a car they are going to take a car that is reliable, that gets

them out of wherever they have been and will get them out of — to where they want to go, so the fact that it was a newer model car initially aroused my interest, along with the fact that Mr. Kretchmar at that time appeared to be a Mexican male. I thought that if he was a Mexican male, if he was possibly an illegal alien from Mexico, that there was a good chance that he had a car that would not belong to him, but there was no way I could tell whether this vehicle was his without stopping him and checking him out, getting his driver's license and registration. * * *

"Q. (By Mr. Bolan) Based on that information and based on what those observations were at that time you stopped the motor vehicle; is that correct?

"A. Yes."

The language of the Fourth Amendment is clear and unmistakable: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, * * *." Fourth Amendment to the Constitution of the United States. Under the majority's holding, a motorist using the roads of this state is without a constitutional guarantee against unreasonable seizure. In reality, the selective enforcement of the law sanctioned here allows the guarantee to adhere to some and not to others. The "others" are those of a specific ethnic type who may be driving a later model car, as here. What characteristics might be a catalyst to an officer's intuition are open to speculation. The majority clearly says there are no Fourth Amendment rights to be free of arbitrary stops on a highway. I disagree.

McCOWN, J., joins in this dissent.

CLINTON, J., dissenting.

In State v. Holmberg, 194 Neb. 337, 231 N. W. 2d 672, we said: "We are not unmindful of the possibility of abuse of the statute as we interpret it. We have no hesitancy in saying that if the facts should

disclose that the stop is a mere pretext for other reasons, it would be held to be arbitrary and unreasonable and violative of the Fourth Amendment. We hasten to state, specifically and emphatically, that a spot check is not to be used as a pretext to search for evidence of some possible crime unrelated to the requirements of section 60-435, R. R. S. 1943." I joined in the majority opinion in that case upon the premise that we meant what we said in the above statement. Apparently all who joined in that opinion did not.

The record here discloses as is demonstrated in the dissent of White, C. Thomas, J., that the officer stopped the car of the defendant on a mere hunch and without any rational cause for suspicion. It was not a bona fide stop to accomplish the purposes authorized by section 60-435, R. R. S. 1943.

The reasons for my views were elaborated in the majority opinion in State v. Colgrove, 198 Neb. 319, at p. 324, 253 N. W. 2d 20 (1977), and I will not repeat them here.

WHITE, C. J., responding to dissents.

The majority opinion is criticized as ignoring the language of the United States Supreme Court in United States v. Brignoni-Ponce, 422 U. S. 873, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975). It is stated that the principles enunciated in that decision clearly suggest the constitutional invalidity of random stops by state patrolmen to check documents. A careful examination of the language employed by the Supreme Court will reveal that no such inference can be drawn.

Brignoni-Ponce involved the activities of the United States Border Patrol, and the only issue presented for decision was whether "a roving patrol may stop a vehicle in an area near the border and question its occupants when the only ground for suspicion is that the occupants appear to be of Mexican ancestry." In holding such stops are prohibited by the Fourth Amendment, the court stated: "We are

unwilling to let the Border Patrol dispense entirely with the requirement that officers must have a reasonable suspicion to justify roving-patrol stops. *In the context of border area stops,* the reasonableness requirement of the Fourth Amendment demands something more than the broad and unlimited discretion sought by the Government. Roads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well. * * *

"We are not convinced that the legitimate needs of law enforcement require this degree of interference with lawful traffic. * * * a requirement of reasonable suspicion for stops allows the Government adequate means of guarding the public interest and also protects residents of the border areas from indiscriminate official interference. Under the circumstances, and even though the intrusion incident to a stop is modest, we conclude that it is not 'reasonable' under the Fourth Amendment to make such stops on a random basis." (Emphasis supplied.)

In a footnote to the opinion the court stated: "Our decision in this case takes into account the special function of the Border Patrol, the importance of the governmental interests in policing the border area, the character of roving-patrol stops, and the availability of alternatives to random stops unsupported by reasonable suspicion. Border Patrol agents have no part in enforcing laws that regulate highway use, and their activities have nothing to do with an inquiry whether motorists and their vehicles are entitled, by virtue of compliance with laws governing highway usage, to be upon the public highways. *Our decision thus does not imply that state and local enforcement agencies are without power to conduct such limited stops as are necessary to enforce laws regarding drivers' licenses, vehicle registration, truck weights, and similar matters.*" (Emphasis supplied.) This language has been previously

quoted in State v. Holmberg, 194 Neb. 337, 231 N. W. 2d 672 (1975).

In United States v. Martinez-Fuerte, 428 U. S. 543, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976), the Supreme Court considered the propriety of Border Patrol operations using permanent checkpoints where all traffic is momentarily stopped and certain vehicles are selectively referred to a secondary inspection area for questioning of the occupants. The defendants argued "that the routine stopping of vehicles at a checkpoint is invalid because Brignoni-Ponce must be read as proscribing any stops in the absence of reasonable suspicion." The court disagreed, finding no constitutional infirmity in the procedure employed. It stated: "The defendants note correctly that to accomodate public and private interests some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure. See Terry v. Ohio, 392 U. S., at 21, and n. 18. But the Fourth Amendment imposes no irreducible requirement of such suspicion. This is clear from Camara v. Municipal Court, 387 U. S. 523 (1967). * * * In Camara the Court required an 'area' warrant to support the reasonableness of inspecting private residences within a particular area for building code violations, but recognized that 'specific knowledge of the conditions of the particular dwelling' was not required to enter any given residence. 387 U. S., at 538. In so holding, the Court examined the government interests advanced to justify such routine intrusions 'upon the constitutionally protected interests of the private citizen,' id., at 534-535, and concluded that under the circumstances the government interests outweighed those of the private citizen.

"We think the same conclusion is appropriate here, where we deal neither with searches nor with the sanctity of private dwellings, ordinarily afforded the most stringent Fourth Amendment protection. See, e.g., McDonald v. United States, 335 U. S. 451

(1948). As we have noted earlier, one's expectation of privacy in an automobile and of freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence. United States v. Ortiz, 422 U. S., at 896 n. 2; see Cardwell v. Lewis, 417 U. S. 583, 590-591 (1974), (plurality opinion). And the reasonableness of the procedures followed in making these checkpoint stops makes the resulting intrusion on the interests of motorists minimal. On the other hand, the purpose of the stops is legitimate and in the public interest, and the need for this enforcement technique is demonstrated by the records in the cases before us. Accordingly, we hold that the stops and questioning at issue may be made in the absence of any individualized suspicion at reasonably located checkpoints."

In footnote 14 therein the court stated: "Stops for questioning, not dissimilar from those involved here, are used widely at state and local levels to enforce laws regarding drivers' licenses, safety requirements, weight limits, and similar matters. The fact that the purpose of such laws is said to be administrative is of limited relevance in weighing their intrusiveness on one's right to travel; and the logic of the defendants' position, if realistically pursued, might prevent enforcement officials from stopping motorists for questioning on these matters in the absence of reasonable suspicion that a law was being violated. As such laws are not before us, we intimate no view respecting them other than to note that *this practice of stopping automobiles briefly for questioning has a long history evidencing its utility and is accepted by motorists as incident to highway use.*" (Emphasis supplied.)

From Martinez-Fuerte it is clear that the Fourth Amendment "imposes no irreducible requirement" of reasonable suspicion based upon specific and articulable facts before a motor vehicle may be

stopped by officers in the performance of their duties. The test is one of balancing the interests at stake, a task which this court performed in State v. Holmberg, *supra*. The fact that an officer may entertain some suspicions concerning the driver of a vehicle should not invalidate an otherwise legal stop pursuant to section 60-435, R. R. S. 1943.