UNITED STATES of America

v.

Kevin L. MONTGOMERY, Appellant.

No. 75–1715.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 19, 1975.

Decided May 26, 1977.

John D. Ferrell, Washington, D.C. (appointed by this court), for appellant.

Mary H. Weiss, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., John A. Terry and Stuart Gerson, Asst. U. S. Attys., Washington, D.C., were on the brief, for appellee.

Before WRIGHT, LEVENTHAL and WILKEY, Circuit Judges.

Opinion for the Court filed by LEVENTHAL, Circuit Judge.

Dissenting opinion by WILKEY, Circuit Judge.

LEVENTHAL, Circuit Judge:

Defendant Montgomery claims on his appeal that the "routine traffic stop" that resulted in the discovery of an unregistered firearm in the car he was driving was a "seizure" lacking the justification required by the Fourth Amendment. Because we find that the stop was not based on an articulable suspicion of criminal behavior as required by the Supreme Court's decisions, nor sufficiently justified as part of a systematically random program of traffic stops, we order the evidence suppressed and reverse defendant's conviction for possession of an unregistered firearm.

## I.  FACTS

Metropolitan Police Officers Brown and Exum first observed defendant Montgomery driving a 1963 Ford in the vicinity of 11th and K Streets, S.E., between 5:30 and 6:30 p. m. on Friday, January 24, 1975. The area is mostly residential with several cor-

ner grocery stores. A few minutes after the initial sighting, the officers again saw defendant driving in the same general area. They followed him around the block in their marked police car and decided to stop him.

The officers acknowledged at trial that defendant was traveling at a moderate speed, not violating any traffic laws. The officers had already checked out the license plates—the car he was driving had not been reported stolen—and they did not have any adverse prior information about either the driver or vehicle before making the stop.

Officer Exum approached the defendant and requested his driver's permit and the registration of his vehicle. When defendant stated that he did not have the permit and registration with him, the officer relayed his name and date of birth through their police radio to obtain computer information from the WALES system (Wide Area Law Enforcement Service). This permitted verification of defendant's claim that he had a valid permit. Five minutes later, the officers were told that there was an outstanding traffic warrant on defendant, and they proceeded to arrest him. During a search pursuant to the arrest, the officers recovered a .38 caliber bullet from appellant's pants' pocket. A subsequent search of the vehicle uncovered a .38 caliber revolver and an unregistered sawed-off shot gun. The trial judge denied a motion to suppress this tangible evidence. Defendant was convicted of possession of an unregistered firearm, and possession of a firearm not identified by serial number.

Both officers described the stop of defendant's car as a routine traffic stop to check the possession and validity of the driver's permit and automobile registration. However, both officers also put it that the defendant had aroused their suspicions. Officer Brown testified: "He aroused our suspicion, sir, in the manner in which he was encircling the area." And later: "it seemed unusual that he would be circling like that. There was really no business places around and . . ." Officer Exum testified: "I observed him appeared to be watching us in the rear view mirror

and looking around" Q. And what did you think at that time? A. Well, you know, wondering why, you know, why . . . (pausing) he was riding around the area." (Tr. 62–63)

If the officer's initial stop of the car was proper, so were the subsequent arrest and searches. So the trial judge held, and that finding is supported by the record. If, however, the initial stop was a violation of defendant's constitutional right, then all the evidence discovered as a result of the stop must be suppressed.

After oral argument, we asked government counsel to provide us with copies of any regulations or instructions bearing on the subject of these traffic stops, and any records made for police department use. In addition we held this case in abeyance pending the Supreme Court's decision in *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). Subsequently, memoranda were received from a defendant in another case, given leave to file amicus curiae, and the government.

## II. STOP FOR SUSPICION OF WRONGDOING

The stop of a moving vehicle—even if the period of detention is brief—involves a "seizure" within the meaning of the Fourth Amendment. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878–82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *cf. Terry v. Ohio*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such a seizure depends on a balance between the public interest and the individual's right to privacy free from arbitrary interference by law officers. *Brignoni-Ponce*, 422 U.S. at 878, 95 S.Ct. 2574; *Terry*, 392 U.S. at 20–21, 88 S.Ct. 1868.

In *Brignoni-Ponce* the Supreme Court held impermissible under the Fourth Amendment stops for questioning by the Border Patrol which were not based on a reasonable suspicion. Although recognizing that a stop was a lesser intrusion than a search, the Court was unwilling to leave the

use of such stops to the unlimited discretion of the Border Patrol. 422 U.S. at 882, 95 S.Ct. 2574. The principle established by *Brignoni-Ponce*, on analogy to the "stop and frisk" decision in *Terry*, 392 U.S. at 21, 88 S.Ct. 1868, is that a vehicle may be stopped for questioning of the occupants when an officer has specific articulable facts which, taken together with rational inferences from those facts, reasonably warrant suspicion of criminal conduct on the part of the occupants. *United States v. Torres-Urena*, 513 F.2d 540, 542 (9th Cir. 1975).

■ In reviewing an officer's grounds for suspicion, courts are to use an objective standard: "would the facts available to the officer at the moment of the seizure or the search 'warrant a [person] of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1880; *Torres-Urena, supra*, at 542. Any lesser standard, the Supreme Court has observed,

> would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result which this Court has consistently refused to sanction. [citations omitted]. "If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers and effects,' only in the discretion of the police."

*Terry*, 392 U.S. at 22, 88 S.Ct. at 1880, *quoting Beck v. Ohio*, 379 U.S. 89, 97, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

■■ The stop in this case appears to have been made in "good faith." But in *Terry* and *Brignoni-Ponce* the Supreme Court made it clear that good faith, accompanied only by inarticulate hunch, is not enough for even the temporary "seizure" of a stop. And that is all that appears on this record. The officers saw defendant some four or five minutes after they originally noticed him, concluded that he had driven around the block, pulled their marked police car behind him and noted that defendant watched them in his rear view mirror and looked around. This may have been reason for an officer to become suspicious enough to keep an eye on defendant. But it can hardly be deemed to be an objective indicator of reasonable suspicion of criminal conduct. There are perfectly legitimate reasons for circling a block, perhaps looking for an address in an unfamiliar neighborhood, or for a parking place close to the address sought, or waiting to meet a friend when parking at or near the location is unavailable. We are no further influenced by the assertion that "defendant appeared to be watching us in the rear view mirror and looking around." To consider mirror glance as enough for a seizure, however temporary, is to accept the adequacy of "inarticulate hunches." Drivers simply do take notice when the police are nearby, and a person circling a block for whatever reason would take notice of a police car following him.

■ The inarticulate hunch, the awareness of something unusual, is reason enough for officers to look sharp. Their knowledge and experience identify many incidents in the course of a day that an untrained eye might pass without any suspicion whatever. But awareness of the unusual, and a proper resolve to keep a sharp eye, is not the same as an articulated suspicion of criminal conduct. Defendant's acts, as reported, were too innocuous to warrant the intrusion of a temporary seizure for questioning.*

■ The general principle that the police may stop for questioning when they have a founded suspicion of criminal behavior includes as a necessary corollary the rule that the police may stop and question the driver of a vehicle when an infraction of the motor vehicle code is seen or suspected. It may be enough that the license plates of the car are partially obscured, or are clean when the rest of the car is dusty, or that some defect in the car is visible, or that the

---

\* *Cf. United States v. McCaleb*, 552 F.2d 717 (6th Cir. 1977) (observation of several factors listed in the DEA "drug courier profile" not sufficient for reasonable suspicion for a stop, since activities were consistent with innocent behavior).

car is being driven in an erratic manner. Even a relatively minor offense that would not of itself lead to an arrest can provide a basis for a stop for questioning and inspection of the driver's permit and registration.[1] However, the stop here was not for an observed or suspected violation; the driver's ability was unchallenged, the plates were visible, and the car had not been reported stolen. In sum, we do not feel that the prosecution has presented facts giving rise to a founded suspicion of wrongdoing.

### III. PERMIT & REGISTRATION INSPECTION

We turn to the government's contention that the stop was legally justified as a routine permit inspection. The government argues that police officers have "unqualified"[2] authority to stop motor vehicles for the purpose of inspecting the drivers' permit and registration cards which operators of vehicles are required to carry.[3] Reliance upon the "administrative" nature of the stop does not supply the requisite justification. "The fact that the purpose of [traffic stop] laws is said to be administrative is of limited relevance in weighing their intrusiveness on one's right to travel . . . ." *United States v. Martinez-Fuerte*, 428 U.S. 543, 560 n. 14, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976).

A broad discretion to make the kind of temporary seizure involved in stops for permit inspection includes a significant intrusion on personal mobility and privacy. That kind of inspection stop involves not only a seizure of the car, but often, perhaps typically, a visual inspection of the interior of the car.[4] The stop is not momentary, but leads to delay—several minutes—to complete a radio check for outstanding traffic warrants. A stop for this purpose will typically be inconvenient and, depending on the personalities and circumstances, may well be embarrassing, perplexing or even fraught with anxiety. A permit-inspection stop is less of an interference then a full search, but it has qualities of intrusiveness that cannot be gainsaid.

On the other side is the public interest in enforcing the vehicle control laws, and the permit and registration requirements. This

---

1. *United States v. Weston*, 151 U.S.App.D.C. 264, 466 F.2d 435 (1972). In that case a police officer on foot patrol saw a bag of trash thrown into the street from the left front side of an idling car. When the officer approached the car the defendant picked up the bag and returned it to the car. The officer then asked to see the defendant's driver's license and car registration, they were not at hand and this led to an arrest. Appellant argued the trash throwing was only a "minor" offense, which the officer had no intention of prosecuting (Appellant's Brief at 13), and that the "incident was over" when the trash was removed (at 267, 466 F.2d at 438). The Court held, however, that the "progression of events warranted all that the officer did." At 268, 466 F.2d at 439. The officer's authority to make inquiry of the defendant was not terminated by the retrieval of the bag, and the defendant's scofflaw conduct from the vehicle provided adequate grounds for a check to see whether his driving credentials were in order.

2. Appellee's Brief at pp. 14–15. "If the police are permitted only to stop motorists who actually violate the law or act suspiciously at a given time, effective enforcement of the traffic regulations would be thwarted."

3. The District of Columbia Motor Vehicle Code requires that "Any individual to whom has been issued a permit to operate a motor vehicle shall have such permit in his immediate possession at all times when operating a motor vehicle in the District and shall exhibit such permit to any police officer when demand is made therefor." 40 D.C.Code § 301(c) (1973). Another provision of the Code requires that every vehicle be registered and that the registration be kept in the vehicle or in the operator's possession. 40 D.C.Code § 104(a) (1973).

4. Under the standard operating procedure of the District of Columbia police department, one officer will take a position on the right side of the vehicle where he can keep the occupants under surveillance, using a flashlight if necessary to peer into the interior of the car. A second officer can then approach the driver's window and ask his questions with less chance of attack. *See, e. g., Palmore v. United States*, 290 A.2d 573, 581 (D.C.Ct.App.1972), *aff'd on jurisdictional grounds only*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342. These precautions, one commentator has observed, "have the net effect of expanding the document check into a general inspection of a car's interior and of its occupants." Note, *Automobile License Checks and the Fourth Amendment*, 60 U.Va.L.Rev. 666, 672 (1974).

interest is substantial, and must be given respectful consideration. Still, it would not seem to be any more weighty then our interest in stemming the flow of illegal immigrants into this country, *see United States v. Ortiz*, 422 U.S. 891, 900, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975) (Appendix to Opinion of Chief Justice Burger, concurring in the judgment). In addition, the need for individual traffic stops as a means of enforcing the traffic laws is less pressing if there are other less intrusive techniques which may be used to achieve the same goals. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 883, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

We approach the problem before us with an awareness that the "practice of stopping automobiles briefly for questioning has a long history evidencing its utility and is accepted by motorists as incident to highway use." *United States v. Martinez-Fuerte*, 428 U.S. 543, 560 n. 14, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). But this history does not answer the question before us: assuming that police do have the power to conduct stops for permit inspection, under what circumstances may it be exercised?

In *Brignoni-Ponce*, 422 U.S. at 883 n. 8, 95 S.Ct. at 2581, the Court observed, "Our decision thus does not imply that state and local enforcement agencies are without power to conduct such limited stops as are necessary to enforce laws regarding drivers' licenses, vehicle registration, truck weights, and similar matters." The Court did not discuss what kinds of "limited" stops it would view as "necessary" for the enforce-

ment of these laws. Other Supreme Court decisions similarly reserve this question.[5]

The underlying reasoning of the border search cases, however, does provide a meaningful framework for analysis of the vehicle stop problem. First, in *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), the Court held unconstitutional the Border Patrol's practice of searching automobiles without probable cause and without consent, simply because they could be found within 100 miles of a U.S. border. The Government attempted to justify this practice by relying heavily on cases dealing with administrative inspections. *E. g., Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970); *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). In rejecting this line of argument, the Court emphasized that the search at issue "was conducted in the unfettered discretion of the members of the Border Patrol . . . precisely the evil the Court saw in *Camara* when it insisted that the 'discretion of the official in the field' be circumscribed by obtaining a warrant." 413 U.S. at 270, 93 S.Ct. at 2538. The Court rejected the other administrative inspection cases partly on the grounds that the private motorist did not, like a businessman in an intensely regulated industry,[6] subject himself to the full rigors of administrative inspection simply by using the public highways. *See* 413 U.S. at 271, 93 S.Ct. 2535.

---

**5.** In *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), the Court noted that probable cause might not be required for inspections of private motor vehicles and stated "It is quite possible, for example, that different considerations would apply to routine safety inspections required as a condition of road use." 422 U.S. at 897 n. 3, 95 S.Ct. at 2589.

In *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Court recognized that a holding which prohibited all stops for questioning on less than some quantum of individualized suspicion might prevent enforcement of laws relating to drivers'

licenses, safety requirements, weight limits and similar matters. It reserved judgment, however, as to the circumstances under which such stops are permissible. *Id.* at 560 n. 14, 96 S.Ct. 3074.

**6.** *Almeida-Sanchez* pointed out that in *Colonnade* the Court had stressed the long history of federal regulation and taxation of liquor, *see* 397 U.S. at 76–77, 90 S.Ct. 774, and that in *Biswell* the Court had noted the pervasive system of regulation and reporting imposed on licensed gun dealers, *see* 406 U.S. at 312 n.1, 315–16, 92 S.Ct. 1593. 413 U.S. at 271, 93 S.Ct. 2535.

In the next of this series of cases, *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Court was concerned with stops rather than searches. It held that members of a roving border patrol team could not stop and question passing motorists unless the officers had reasonable basis for suspecting that the private vehicles contained illegal aliens. The primary reason given for imposing this restriction on the operations of the Border Patrol was the Court's appreciation that an unlimited discretion to stop vehicles was a threat to individual freedom to use the highways.

> To approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers. The only formal limitation on that discretion appears to be the administrative regulation defining the term "reasonable distance" in § 287(a)(3) to mean within 100 miles from the border. . . . Thus, if we approved the Government's position in this case, Border Patrol officers could stop motorists at random for questioning, day or night, anywhere within 100 air miles of the 2,000 mile border, on a city street, a busy highway, or a desert road, without any reason to suspect that they have violated any law.

422 U.S. at 882–83, 95 S.Ct. at 2581.

The Court further articulated its objections to discretionary stops in the companion case, *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), in which it struck down discretionary searches at fixed Border Patrol checkpoints. The Court recognized two grounds for distinguishing between police action taken at a fixed checkpoint and that taken by roving patrols:

> First, a checkpoint officer's discretion in deciding which cars to search is limited by the location of the checkpoint. That location is determined by high-level Border Patrol officials, using criteria that include the degree of inconvenience to the public and the potential for safe operation, as well as the potential for detecting and deterring the illegal movement of aliens.
>
> Second, the circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving patrol stop. Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.

Although the Court found that these differences were not sufficient to justify discretionary *searches* at the checkpoints, it noted that "the differences between a roving patrol and checkpoint would be significant in determining the propriety of the stop, which is considerably less intrusive than a search." 422 U.S. at 894, 95 S.Ct. at 2587.

Finally, in *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Court relied on these differences to uphold routine stops without suspicion at Border Patrol checkpoints. Checkpoint stops were seen to be less than roving stops because:

> the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop.

*Id.* at 558, 96 S.Ct. at 3083. The fixed location was seen to be an important limitation on the discretion of the individual officials:

> The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less

room for abusive or harassing stops of the individuals than there was in the case of roving patrol stops.

*Id.* at 559, 96 S.Ct. at 3083.[7]

From these Supreme Court decisions we draw several conclusions. First, the intrusiveness of a police stop of a private motorist is to be measured not only by objective criteria, such as the period of time for which the vehicle is detained, but also in terms of the stop's subjective impact. A roving police stop is a more serious intrusion than a predicted checkpoint inspection, because the unexpected stop is pregnant with greater annoyance and inconvenience, and more likely to frighten or embarrass.[8]

Second, the possibilities for stops that are harassing or more intrusive are heightened by a rule that vests the field officer with absolute discretion to stop and question passing motorists. Under that formulation there can be no effective control over arbitrary or harassing police action. The discretion of the field officer can be controlled, however, by a program staked out in advance by superior officials, which includes as safeguards specific instructions to be followed by field officers.

These principles, evolved for governance of the vexing problem of police checks for illegal aliens, can be given appropriate application so as to control police activities in enforcing the motor vehicle laws. An unexpected police stop for a driver's license inspection may cause the same subjective reactions as a stop for any other law enforcement purpose.[9] The same possibilities for police abuse are present in the unchecked power to make stops for asserted "traffic" purposes. However, the conduct of vehicle stops in accordance with instructions issued by the superior officials as part of a publicly understood program for enforcement of the motor vehicle laws may reduce both police abuse and citizen apprehension to a level consistent with the Fourth Amendment's objectives.[10]

*Martinez-Fuerte* indicates one permissible format would use predetermined checkpoints, at which vehicles could be stopped for permit inspection. These could be changed to different locations, with frequent rotation. Public response to such a systematic program would insure that it does not become too burdensome to individual citizens. It would not be necessary to stop every vehicle passing each checkpoint,

---

7. Because stops at a fixed checkpoint were seen to be minimally intrusive, the police were permitted to use their discretion to select from the cars passing the checkpoint a limited number for diversion and questioning. *Martinez-Fuerte* at 563–64, 96 S.Ct. 3074.

8. The D.C. police have been sufficiently sensitive to the problem for the superiors to issue instructions that the officers give to each detained motorist a signed form explaining that they are only conducting a routine "spot" check. General Order No. 303.1 I.H. (Effective Date August 1, 1974) provides
   Members of the department who conduct spot checks, in addition to extending the usual courtesies, shall carry and give to each motorist stopped for that purpose, a "Departmental Spot Check Form" explaining the purpose and necessity of the spot check procedure. The form shall be signed by the issuing officer and given to the motorist at the time the officer returns the operator's permit and vehicle registration document.
   *See also* Tactical Branch Memorandum by Captain Bryant A. Hopkins, February 25, 1975 (noting that field officers were not complying with instruction to give out forms, and emphasizing this requirement). The form, entitled

"What This 'Spot Check' Means To You" states:
   We as police officers, frequently stop motorists in various areas of the city for routine traffic or "SPOT" checks. This is done to combat the many serious injury and property damage accidents caused by unlicensed operators. We also do it to combat the extensive stolen auto problem which is not confined to any one area and affects many persons.
   This document may moderate embarrassment or vexation for delay, but it does not eliminate the impact of the stop.

9. In addition, a stop for permit and registration inspection, including inspection of both documents, completion of the Police Department's Form 76, and a WALES computer check by radio, may take considerably more time than the one minute check for citizenship in the border stop cases. *See United States v. Brignoni-Ponce,* 422 U.S. 873, 880, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

10. *See* Note, *Automobile License Checks and the Fourth Amendment,* 60 Va.L.Rev. 666, 693–95 (1974).

as long as a regular procedure was followed.[11]

Roving patrol cars might also be permitted to make vehicle stops assuming appropriate instructions. Random stops would be permissible, provided they are truly random. The important point is that the stops be made in some *systematic* fashion, prescribed in advance by superiors.

■ Stops are not random simply because they are left to the officer's discretion. In that formulation there lurks the possibility that assertedly "random" stops will be used to harass where reasonable grounds for suspicion do not exist. The courts have had experience with stops represented as a "random traffic stop" but found to be a pretext for investigation of other matters.[12]

Our views on the problem of traffic stops are generally congruent with the decisions of other courts. The courts have approved the use of roadblocks and other systematic procedures for stopping automobiles for permit inspections.[13] Yet several courts have disapproved of police techniques which permit field officers to single out individual motorists for questioning,[14] and other courts have specifically reserved judgment as to the constitutionality of such discretionary stops.[15] Of our sister circuits, only one, the Fourth,[16] has announced that a roving po-

11. See note 7, *supra.*

12. *E. g., United States v. Carrizoza-Gaxiola,* 523 F.2d 239 (9th Cir. 1975); *United States v. Cupps,* 503 F.2d 277, 282 (6th Cir. 1974); *People v. McPherson,* 550 P.2d 311, 314 (Colo. 1976); *State v. Colley,* 229 N.W.2d 755, 758 (Iowa 1975); *Palmore v. United States,* 290 A.2d 573, 582 (D.C.1972), aff'd on jurisdictional grounds only, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1972); *State v. Holmberg,* 194 Neb. 337, 231 N.W.2d 672, 678 (1975); *People v. Harr,* 93 Ill.App.2d 146, 235 N.E.2d 1 (1968).

13. *United States v. Croft,* 429 F.2d 884, 886 (10th Cir. 1970); *People v. Ingle,* 36 N.Y.2d 413, 369 N.Y.S.2d 67, 330 N.E.2d 39, 44 (1975); *People v. Andrews,* 173 Colo. 510, 484 P.2d 1207, 1209 (1971); *Morgan v. Town of Heidelberg,* 246 Miss. 481, 150 So.2d 512 (Miss.1963); *Commonwealth v. Mitchell,* 355 S.W.2d 686 (Ky.1962); *see United States v. Cupps,* 503 F.2d 277, 280 (6th Cir. 1974) (*citing Mitchell, supra,* with approval); *see also People v. Swanger,* 453 Pa. 107, 307 A.2d 875, 877 n.3 (1973) (distinguishing systematic or roadblock stops from selective enforcement).

14. *State v. Ochoa,* 112 Ariz. 582, 544 P.2d 1097 (1976); *People v. Ingle,* 36 N.Y.2d 413, 369 N.Y.S.2d 67, 330 N.E.2d 39 (1975); *People v. Swanger,* 453 Pa. 107, 307 A.2d 875 (1973); *see United States v. Croft,* 429 F.2d 884, 886 (10th Cir. 1970).

15. *United States v. Cupps,* 503 F.2d 277, 280 n.7 (6th Cir. 1974); *United States v. De Marco,* 488 F.2d 828, 831 n.6 (2d Cir. 1973); *United States v. Nicholas,* 448 F.2d 622, 626 (8th Cir. 1971).

Some state courts have upheld selective stops to enforce the motor vehicle laws, *State v. Holmberg,* 194 Neb. 337, 231 N.W.2d 672 (1975); *State v. Allen,* 282 N.C. 503, 194 S.E.2d 9 (1973); *Palmore v. United States,* 290 A.2d

573, aff'd on jurisdictional grounds only, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1972); *State v. Gray,* 59 N.J. 563, 285 A.2d 1 (1971); but two of these decisions expressly state that a routine traffic stop may not be used as a pretext to investigate other suspected criminal activity. *State v. Holmberg, supra,* 231 N.W.2d at 678; *Palmore v. United States, supra,* 290 A.2d at 582–83. It has also been pointed out that the stop in *State v. Allen, supra,* could have been upheld on *Terry* principles of "articulate suspicion." Note, *Automobile License Checks and the Fourth Amendment,* 60 U.Va.L. Rev. 666, 674 (1974).

16. *United States v. Kelley,* 462 F.2d 372 (4th Cir. 1972).

The Fourth Circuit relied on a decision of the Eighth Circuit, *United States v. Turner,* 442 F.2d 1146 (8th Cir. 1971), which was later virtually confined to its facts. *United States v. Nicholas,* 448 F.2d 622 (8th Cir. 1971). The Fourth Circuit also cited a 1965 decision of the Ninth Circuit, *D'Argento v. United States,* 353 F.2d 327 (9th Cir. 1965), cert. denied, 384 U.S. 963, 86 S.Ct. 1591, 16 L.Ed.2d 675 (1966), which in turn relied on that court's decision in *Lipton v. United States,* 348 F.2d 591 (9th Cir. 1965). In 1975, the Ninth Circuit, taking note of the intervening Supreme Court decision in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), questioned the vitality and limited the scope of its earlier *Lipton* opinion. *United States v. Carrizoza-Gaxiola,* 523 F.2d 239, 241 (9th Cir. 1975).

The Fifth Circuit, in 1967, approved "reasonable roadchecks to ascertain whether man and machine meet the legislative determination of fitness," *Myricks v. United States,* 370 F.2d 901, 904 (5th Cir. 1967), cert. dism'd, 386 U.S. 1015, 87 S.Ct. 1366, 18 L.Ed.2d 474 but the breadth of this holding is not clear. Similarly unclear is the scope of the Tenth Circuit's decision in *United States v. Lepinski,* 460 F.2d 234,

lice patrol has complete discretion in stopping individual motorists. With all deference, that opinion relied on precedents subsequently limited and questioned (see note 16), and chose to speak broadly on facts (the stop of a truck "tipped" on a warehouse theft) which came within the ambit of the *Terry* standard of articulable suspicion.

We have examined with particular care the decision of the District of Columbia Court of Appeals in *Palmore v. United States,* 290 A.2d 573 (1972), *aff'd on jurisdictional grounds only,* 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1972). In that decision the court upheld permit inspection stops as necessary to enforce the motor vehicle laws. 290 A.2d at 582. It then confined its holding in the following way:

> We hasten to add that the courts, including ours, have warned law enforcement officers, specifically and emphatically, that a so-called "spot check" is *not* to be "used as a substitute for a search for evidence of some possible crime unrelated to possession of a driver's permit." *Mincy v. District of Columbia,* 218 A.2d 507, 508 (D.C.App.1966), (and the cases cited at 508 n. 3).

*Id.* While the language of this opinion is somewhat more permissive than our own, we note that it was decided before the Supreme Court's decisions in *Brignoni-Ponce* and *Martinez-Fuerte,* and their guidance on the intrusiveness of discretionary stops.

■ Upon application of these legal standards to the facts of this case, it is clear that the police officers' stop of defendant's car cannot be justified as a "spot" check. The police officers admitted that defendant's car had not been randomly selected, but chosen because it aroused their suspicion. Although the trial judge originally thought that the stop was justified as a "routine traffic stop," at the rehearing of the motion to suppress after the trial he concluded:

> The evidence in this case was that the officer saw this defendant cruising repeatedly through a particular neighborhood, looking around in a suspicious manner. And from that a reasonably prudent officer could conclude that he might well have been trying to case some place in the neighborhood, or what not, . . ." (Tr. 11).

In short, this was a stop to discover evidence where no adequate grounds for suspicion existed. This inspecting of defendant's driver's license was not conducted for the purpose of enforcing the vehicle control laws, but was a maneuver for investigating defendant's "suspicious" conduct.

The considerations underlying our conclusion concerning the invalidity of the discretionary permit-stop are confirmed by the record evidence indicating how the so-called vehicle spot check program in force in the District of Columbia is being used. A departmental order states that officers are authorized to stop motor vehicles "at random" to determine whether an operator has in his possession a valid operator's permit and recites that the justification for such "spot checks" is limited to assuring that only properly qualified persons operate motor vehicles.[17] The reality, however, as it emerges in the testimony, is that the indi-

---

237 (10th Cir. 1972). Finally, it should be noted that all of these decisions preceded the Supreme Court opinions in *Brignoni-Ponce* (June 30, 1975) and *Martinez-Fuerte* (July 6, 1976).

17. General Order, Series 304, No. 10 (Effective July 1, 1973) provides at p. 9:

> D.C.Code § 40–301(c) (1967) provides that, for the safety of the public, every motor vehicle operator is required to obtain a permit and have that permit in his immediate possession while operating a motor vehicle in the District of Columbia. The operator is further required to exhibit the permit to any police officer upon demand. Because of

these requirements, officers are authorized to stop motor vehicles at random to determine if an operator has in his possession a valid operator's permit.

It continues at p. 10:

> Vehicle spot check authority is a valuable tool in assuring that only properly licensed and qualified persons operate motor vehicles on District of Columbia streets. It has no other justification, however, and shall not be used as a means to support other police-citizen encounters not specifically authorized under one or more sections of this order.

vidual police officer is free to use the vehicle spot check authority as a basis to stop and question any vehicle driver he pleases, on bare suspicion of other possible crimes past or potential.

Officer Exum's testimony confirms the foregoing. On cross-examination the following colloquy occurred:

Q. . . . Officer, let me ask you this. What criteria, or what situations, under what situation or what criteria do you personally use in making what we call a routine traffic check, or spot check if someone has an operator's permit, or a registration with him? (Pausing) In other words, in what situations do you make this traffic stop?

A. Well, there are several. If he commits a violation, you know, if he is acting in a suspicious manner and you observe him several times in any area, you know, that you may think he's—he may be thinking about—he's about to, or have committed a crime.

Additionally corroborative of the purpose for which spot checks are being used are the elaborate records which the police department requires the field officers to keep.[18] After each stop, the officer is directed to fill out a card on which there are blanks for the citizen's race, sex, date of birth, height, weight, color of eyes and hair, complexion, scars, tattoos, clothing, facial hair and nickname.[19] Why would the police need this information, in addition to the name and address of the driver and the place, time and purpose of the stop, if the purpose is that of enforcing the motor vehicle code? Officer Exum's testimony continues:

The main purpose of the spot check is to obtain the identity of the subject, a description of the subject. We have a 3 × 5 card that we put this information on

and it is sent to the precinct of that area in case of . . . a subject fitting a description, you know, later of crime committed in that area and the subject, if we get a lookout, we have a—we may have the description of that subject on a 3 × 5 card." (Tr. 68).

Thus, in Officer Exum's understanding, the spot-check program was to gather information about the whereabouts and activities of various "suspicious" citizens, in case a criminal act was later reported in the vicinity. Government counsel do not contend on appeal that the Exum testimony gives a misleading impression of prevalent police practice, but instead defend the result as permitted by the plenary discretion of police officers to make stops.

■■■■■ The exercise of the police power to stop motorists for such surveillance purposes is clearly contrary to the spirit of the Fourth Amendment. This is not to say that patrolmen may not observe and take notes of unusual, or even usual, occurrences on their beat; such vigilance is the hallmark of good police work. A policeman may address questions to anyone on the street. But the person may not be detained merely because he refuses to cooperate and goes on his way. White, J., concurring in *Terry v. Ohio*, 392 U.S. at 34, 88 S.Ct. 1868. Here we have an assertion of a police right to engage in greater intrusions—a right to stop a moving vehicle, and to compel responses (documents). The use of the state's coercive power to detain citizens, without reasonable suspicion, and interrogate them to create a record of their activities, involves an interference with individual autonomy which cannot be reconciled with American notions of personal privacy and mobility.

We find in the District's vehicle spot check procedures the same features that

---

**18.** General Order 304, No. 10, *supra*, provides at p. 11:

Whenever a vehicle is stopped under motor vehicle spot check authority pursuant to part I, paragraph D of this order, in addition to the form explaining the purpose of the spot

check which is to be given to the motorist, the officer conducting the vehicle spot check shall complete a PD Form 76, which shall be forwarded to his commanding officer.

**19.** Police Department Form 76 (June, 1973).

led, in *Gomez v. Wilson*,[20] to judicial condemnation of the District's program for surveillance of pedestrians. Under that program, the police could, regardless of whether grounds for a *Terry* stop existed, detain and question any "suspicious" person on the city streets about his or her activities. The information obtained from the interrogation was recorded on a form similar to the 3 × 5 card involved here, and then indexed and cross-indexed in police files.[21] This practice was held unconstitutional in a direct challenge in civil litigation,[22] and the District did not appeal.[23] That aspect of police power with which *Gomez* was concerned—discretionary authority to stop and question citizens—lies at the heart of the District's traffic check program. Because it carries with it the same potential for abuse that was demonstrated in *Gomez*, that power must be subjected to clear programmatic instructions designed to reduce the intrusiveness of the stops and limit the possibilities for harassment. Indeed, we note that the practices declared unconstitutional in *Gomez* actually began as an extension to pedestrians of the "spot" check program involved in this case. *See* 323 F.Supp. at 90. This growth of one unconstitutional program from another evidences the potentially cancerous nature of excessive police power.

## IV. CONCLUSION

Any decision that holds a "stop" to be an unlawful intrusion on privacy invites hyperbolic opposition on the ground of unreasonable interference with police officers who were only acting reasonably in coping with criminals. Of course those who come into court are criminals. The other citizens who were stopped and delayed in their pursuits are not charged and so the cases do not erupt in court.

**20.** 323 F.Supp. 87 (D.D.C.1971), *on appeal,* 155 U.S.App.D.C. 242, 477 F.2d 411 (1973).

**21.** 323 F.Supp. at 90 n. 4.

**22.** 323 F.Supp. at 93.

**23.** 155 U.S.App.D.C. at 245 & n. 10, 477 F.2d at 414 & n. 10.

Doubtless more crimes would be solved if all persons were subject to unrestricted police authority to stop and identify. Why not, it might be argued, since the innocent will have nothing to hide? If one is not sensitive to the implications for an open society, no amount of comment can explicate.

Once it is accepted that the police are subject to some restraint, the issue is one of drawing the line. In this case we have proceeded deliberately. There has been delay while we awaited Supreme Court guidance. And a court is cautious before determining to overturn a conviction notwithstanding evidence of guilt. Indeed, we denied defendant's application for release pending appeal, despite the running of time on a sentence of an indefinite period, and notwithstanding the malaise signaled by the divergent rulings of the district court.

As to the merits, the Supreme Court has laid it out that the police do not have an unrestricted right to stop people, either pedestrians or drivers. The "good faith" of the police is not enough, nor is an inarticulate hunch. They must have an articulable suspicion of wrongdoing, done or in prospect. In this case there was nothing more than a hunch, the driver was circling the block in a residential neighborhood, and when he discovered that the police were following him he looked at them in the rear view mirror.

This record reflects another problem: the police approach that nothing much is involved in a stop to ask a driver for vehicle registration and permits. Of course, a vehicle stop gives more than that, an opportunity for surveillance. The power to make stops at will gives power to pick and choose arbitrarily. Some judges apparently seem ready to accept that position.[24] Indeed, in

**24.** *See, e. g.,* oral ruling of Corcoran, J., in *United States v. Gibson* (D.D.C. July 6, 1976):
"... as a matter of fact, I don't find it an unreasonable procedure for the police to spot check a driver in this day and age when the automobile is king and there are so many

the case at bar the trial judge began by accepting wholeheartedly the prosecutor's argument that there was unrestricted authority to make a vehicle stop. Later on, he blended that with a ruling that in this case there was reasonable suspicion. Suspicion, perhaps, but reasonable and articulable suspicion? Not on this record.

What seems to be emerging is a third tier. Probable cause for arrest. Reasonable suspicion for a pedestrian stop. And "slight" suspicion for a vehicle stop to inspect papers. We do not think this is the fair import of the Supreme Court decisions.

■■■■ We respect the need to enforce the motor vehicle codes, but this does not require authority for purely discretionary traffic stops. Where articulable grounds for suspecting a violation are present, the police may still stop and question. They may also stop motorists on a regularized basis—at checkpoints, or on a truly random selection. But the police cannot use "spot check" as a talisman to justify stops—while modifying the core concept of spot check to drop the characteristic of a sample or random selection, retaining only the characteristic of haste.[25]

Our ruling today is predicated on the assumption that systematic procedures available to the police are indeed adequate to enforce the motor vehicle laws. If these prove unworkable or ineffective, and the Metropolitan Police Department issues regulations in support of different procedures on the ground that these are workable, the issues raised herein will be ripe for reconsideration. Until that time, however, we expect that traffic stops will be made in a manner consistent with the freedoms of our citizens as outlined in this opinion.

In saying that the vehicle stop before us lacked justification we do not close the door to a systematic rethinking by the police department of the elements of a reasonable and perhaps necessary vehicle "stop" program. With efforts at the supervisory level to develop standards, and to proceed on something more than an assumption of virtually untrammeled latitude to stop vehicles for paper inspection, there may be room for an approach that permits a vehicle stop on an articulable suspicion that is not as strong as that required for a more protracted *Terry* stop. There will always be room for judgment of the individual police officer. The provision of standards as an even-handed framework for the exercise of judgment by the individual police officer provides the kind of restraint on arbitrariness that identifies the Supreme Court's border area rulings. With his characteristic felicity, Justice Jackson struck close to the mark in discussing the philosophy of the equal protection clause. Concurring in *Railway Express Agency v. New York*, 336 U.S. 106, 112–13, 69 S.Ct. 463, 467, 93 L.Ed. 533 (1949), he said:

> [N]othing opens the door to arbitrary action so effectively as to allow . . . officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected.

*Reversed and remanded for further proceedings not inconsistent with this opinion.*

WILKEY, Circuit Judge, dissenting:

This is precisely the type decision which has given the exclusionary rule a bad name.

---

horrible drivers on the road, and so many people are using the highways for illegal purposes.

  . . . [I]n the public interest, the police should have the power to spot check at will without having to find the driver speeding or to find the driver going down the wrong way, and what not, on a one-way street."

This was called to our attention by memorandum of amicus curiae.

**25.** The requirement of random or sample appears in the dictionary definitions of "spot

check" contained in, e. g., Webster's New Internat'l Dictionary, Third ed. (1961); American Heritage Dictionary (1969); Random House Dictionary (1966). Laxity appears in some dictionaries to permit use of the term in a secondary meaning, for a check made quickly even though lacking the characteristic of a sample. E. g. World Book Dictionary (1967 ed). This relaxation in language does not warrant relaxation in law.

The officers here did what their training had taught them to do; they did in fact what any citizen except the offender here would have had them do.[1] Their conduct was reasonable under the circumstances; in my view they violated no one's constitutional rights. Yet two of my colleagues here hold that they crossed a constitutional line so fine that it has taken us more than a year of time to draw it.[2]

## I

The majority holds that police officers on normal patrol in a neighborhood with which they are intimately familiar cannot stop a driver (or inferentially a pedestrian) to identify him when suspicious circumstances have been personally observed by the officers. In practical effect, they must wait for a crime to be committed before taking effective action. For continuous, prolonged observation of the suspect, keeping "a sharp eye" as recommended by the majority,[3] will result in causing the suspect's departure to wait for a more propitious time. And, according to the majority,[4] the officers are forbidden even a simple stop to identify the suspect so that, if later a crime does occur with a description of the offender matching this suspect, the police will know for whom and where to look.

Within five minutes of the stop here the police had ascertained:

1. His name, address, physical description, date of birth, and auto operator's license—which is all the police would have sought to ascertain if nothing further had come to their attention. But something did.

2. The suspect had an arrest warrant outstanding against him. The officers then conducted a search.

3. He had a .38 caliber bullet in his pants pocket;

4. A .38 caliber Smith & Wesson Magnum revolver without serial number, loaded with six rounds, in the car; and

5. An unregistered sawed off shotgun with shells in the car.

My colleagues would exclude all this on the ground there was no reasonable suspicion justifying the original stop.[5]

This standard cannot give us the reasonably effective police protection to which our citizens are entitled, nor does it permit the type police action which I believe the Supreme Court has sanctioned in its decisions for many years. All cases of this type turn on the combination of circumstances visible to the officers at the moment, and the combinations are of an infinite variety. This was a stop on suspicion which, however crudely, the officers did articulate.[6] The officers were trained and experienced.

---

1. *See* Griswold, *Search and Seizure—A Dilemma of the Supreme Court*, The Roscoe Pound Lectures (1975) at pp. 57–58:

   While I was Solicitor General it fell to my responsibility to decide in many cases whether the United States should seek review of adverse decisions in lower courts in search and seizure cases. I developed in my own mind a working rule for this purpose, which I found fairly easy to apply, and which proved to be effective in many cases. It was a somewhat homely rule, and it was not formulated with the precision of a statute. It was as follows: If the police officer acted decently, and if he did what you would expect a good careful conscientious police officer to do under the circumstances, then he should be supported.

   While this was formulated as a rule of action in seeking certiorari, not as a principle for judicial decision in a particular case, I submit it provides a good lodestar for guidance in discerning where the majority strays from the path of reasonableness and practicality here.

2. Nineteen days of this period were subject to our order of 17 June 1976 awaiting guidance from the Supreme Court in *United States v. Martinez-Fuerte* (6 July 1976), and it is fair to say that prior to issuing the formal order we had delayed our consideration in the expectation of further Supreme Court guidance—all of which indicates the closeness of the decision here.

3. Maj.op. at ——— of 182 U.S.App.D.C., at 879 of 561 F.2d.

4. *Ibid.*

5. We all agree that if the police action was lawful until the discovery of the outstanding warrant, all subsequent actions were valid.

6. 1 App. 13, 33, 36, 65–67.

They were thoroughly familiar with this neighborhood. Actions, gestures, even a failure of an individual to do the normal and expected thing, would carry positive meaning to them, would create a "reasonable suspicion" in them when the same incidents would neither attract notice nor much less create curiosity in the average passerby. The neighborhood was mostly residential, not business. The driver Montgomery was circling the block, repeatedly. "We saw him on several occasions in the area." ". . . [I]t seemed unusual that he would be circling like that." (Presumably the officers would not have stopped a driver doing the same thing for the same length of time in front of Union Station.) ". . . [T]he speed at which he was traveling? . . . [A] little slow, that's all." "He appeared to be watching us in the rear view mirror." The date was in January, the time of the arrest was 6:00 p.m., street lights were on.

Of course, there *are* innocent explanations for all these observed activities. Likewise, there are innocent explanations for the wheel man parked in front of the bank while it is being robbed, running his engine in preparation for the getaway. There could be an innocent explanation for any conceivable set of circumstances, no matter how damning. The officers' job is to look at what is visible,[7] weigh the possibilities and probabilities of a valid innocent explanation as contrasted with the chance that mischief is afoot, and then determine on the spot at the moment if at least inquiry is warranted.

7. Before removing the pistol and shotgun, the officers also saw two plastic bags and a ski mask in the car, but this observation was made at the precinct house. 1 App. 51.

8. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

9. 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

10. Plus a Ninth Circuit decision, *United States v. Torres-Urena*, 513 F.2d 540 (9th Cir. 1975). Cf. *United States v. Magda*, 547 F.2d 756 (2d Cir. 1976), and *United States v. Purry*, 178 U.S.App.D.C. 139, 545 F.2d 217 (1976).

11. I agree that the stop should not be justified as a "Permit and Registration Inspection," not because there cannot be such a stop, but be-

That is all the officers did here. Four federal judges have now analyzed this really simple, far from ordinary set of circumstances with the great clarity of hindsight. The District Judge and I think the officers had a reasonable suspicion and did the right thing; my two colleagues think not, and so the convictions for carrying a .38 caliber pistol and a sawed off shotgun will be voided.

## II

It would be a useless expenditure of judicial energy for me to write a lengthy dissent in this case. The recent Supreme Court decisions on the Fourth Amendment and the exclusionary rule are there for all to read. The majority cite only *Terry v. Ohio* (1968) [8] and *United States v. Brignoni-Ponce* (1975) [9] from the Supreme Court [10] on the critical issue of "Stop For Suspicion of Wrongdoing," [11] and neither on its facts is decisive or even very helpful in deciding Montgomery's case on motion to suppress. What we have here is a *Terry*-type stop, but of a driver, which necessitates stopping the car for a brief inquiry. I submit that, if Montgomery had been a pedestrian doing comparable things, the officers would have been entitled to engage him in conversation long enough to take a good look at him and establish his identity—which is all the officers wanted here, in the absence of discovery of any further suspicious circumstances.

cause the officers' testimony showed this was not the true basis. The District Judge correctly so found on rehearing the motion to suppress after trial. 2 App. 11. Since we all agree that on the *facts* the stop was *not* executed on the "Permit and Registration Inspection" basis (see Maj.Op. —— of 182 U.S.App.D.C., 885 of 561 F.2d), it follows that no discussion of *law* on this point is necessary at all. Virtually all of the majority opinion from page 7 on is a gratuitous legal discussion of a non-issue. Since the officers admittedly made the stop on a "Suspicion of Wrongdoing" basis, the decision hinges on the law applicable to the facts giving the officers a suspicion of wrongdoing. On this issue I disagree with my colleagues, and it is this issue, not routine spot checks, on which this case turns.

The case which is closest on the facts and law is *United States v. Willie Robinson* (1973) [12] in which the Supreme Court reversed a 5–4 *en banc* decision of this court suppressing evidence. In *Willie Robinson* the officer had learned that the record in the License Bureau did not square with the driver's license previously exhibited by Robinson; here, comparably, the officers observed the suspicious circumstances of the driver's conduct in the immediate neighborhood. In *Robinson* the officer's knowledge was acquired some four days earlier; here the knowledge was gained a few minutes prior to the stop and acted on (necessarily) immediately. In both cases the officers had knowledge of suspicious facts which inspired their further inquiry, which in turn resulted in a search and discovered evidence of a hitherto unsuspected crime. *Robinson* and *Brignoni-Ponce* both hold that a stop on "reasonable suspicion" is valid, and that is Montgomery's case.

To me it is highly significant that in the last complete term of the Supreme Court (September 1975—July 1976) there were eight search and seizure exclusionary rule cases; in all eight the Court reversed a state or lower federal court decision suppressing evidence.[13] Without in any way arguing that the facts in all these cases are comparable to that of Montgomery here, I submit that a reading of these eight decisions cannot do other than demonstrate that the hypertechnicalities which were for some time in vogue are no longer to be applied in search and seizure cases, where

the conduct of the officer in making a stop, an arrest, and accompanying search is eminently reasonable, in no way offensive to standards of reasonable proper conduct by which we would have police guided under equivalent circumstances in making stops and searches of any citizen, including ourselves. The message should come through loud and clear, especially to the court which decided *Willie Robinson*.

### III

Not only is the majority decision, in my judgment, wrong on current Supreme Court standards, but it—the facts and the legal principles enunciated—serves as a perfect example of why we shall never be able to solve one of our most pressing urban social problems, so long as judicial decisions like this persist. Control of handguns in this country, whether by laws presently on the books or by any proposed laws of which I have heard, can never be remotely effective so long as the police are restricted in even inquiry, and likewise search and seizure, as the principles of this decision do here. We have laws in the District of Columbia sufficiently effective to convict Montgomery on two charges, and sufficiently broad to say that he could never legally have possessed that pistol and sawed off shotgun anywhere anytime.

Laws on the books are only as effective as they can be effectively enforced. No

**12.** 410 U.S. 982, 93 S.Ct. 1500, 36 L.Ed.2d 177 (1973), reversing 153 U.S.App.D.C. 114, 471 F.2d 1082 (1972) (Opinion by Judge Wright for the four in plurality, Chief Judge Bazelon concurring specially, Judge Wilkey for the four in dissent). Former Solicitor General Griswold has stated that he was guided by his rubric, note 1, *supra* in determining to seek certiorari and in ultimately securing the reversal of the case. Griswold, *supra* at 64. He further commented:

The *Robinson* case . . . upheld the validity of the search. Not only did it support the validity of my rubric, but it also showed the inclination of the Court today to decide some of these cases on a fairly broad basis, for the Court held that a full search is not unreasonable, and is, thus, valid, whenever a

valid arrest is made. *This is a rule that police officers can understand.*
*Id.* at 66. Emphasis added.

**13.** *Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975); *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976); *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).

country in the English-speaking world [14] (and none of which I am aware in those parts of the world having the European civil law system) has a rule excluding material evidence illegally obtained. In every country, material evidence, if probative and authentic, comes in without question as to the legality of its acquisition by the prosecution.[15] Only in the United States must the police meet a standard of "reasonableness" or "probable cause," imposed by a court after the event, such as laid down here, on penalty of having the evidence excluded and the prosecution quashed.[16] And only in the United States do we have the terrible problem of the handgun, and crime attributed to handguns, in our society.[17]

This is an issue which I believe has been avoided and evaded by proponents of strict-

er gun control legislation, because, I suspect, the people most ardently championing stricter gun control are in many instances those who favor a very high standard of probable cause under the Fourth Amendment to justify police searches for weapons and the exclusionary rule as a penalty for violations. Without in any way taking either side in the gun control legislation debate, and without voicing any philosophical, historical, or legal argument on the proper standard of reasonableness under the Fourth Amendment, I simply point out this practical contradiction in the position of many sincere partisans in both debates.

I do assert that so long as courts adhere to a standard of reasonableness or probable cause as enunciated by the majority here on these circumstances, and then enforce the exclusionary rule (as we must under Su-

---

**14.** The leading case in the British Commonwealth is *Kuruma v. The Queen*, [1955] All E.R. 236, which arose from Kenya. In appealing the death sentence it was argued that the search, which uncovered a knife and ammunition, was illegal. In dismissing the appeal, the Privy Council held, in the words of Lord Goddard, C. J., that

> In their Lordships' opinion, the test to be applied in considering whether the evidence is admissible is whether it is relevant to the matters in issue. If it is, it is admissible and the court is not concerned with how the evidence was obtained.

*Id.* at 239.

A century earlier an English judge put it more laconically, "It matters not how you get it; if you steal it, it will still be admissible in evidence." Crompton, J., in *R. v. Leatham* [1861] 8 Cox C.C. 498 at 501.

The text on evidence most universally used throughout the British Commonwealth puts the rule:

> It may therefore be concluded that, under English law, illegally obtained evidence is admissible, provided it does not involve a reference to an inadmissible confession of guilt, and subject to the overall exclusionary discretion enjoyed by the judge at a criminal trial.

*Cross on Evidence* (3d Ed., 1967), p. 267. See discussion generally pp. 266–270. ". . . [T]he English authorities on the admissibility of evidence procured in consequence of an illegal search or other unlawful act . . . are uniformly in favor of its reception although there are not many of them." *Id.* at 266.

**15.** "This evidentiary rule is unique to American jurisprudence." Chief Burger, dissenting in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 at 415, 91 S.Ct. 1999, 2014, 29 L.Ed.2d 619 (1971). Two examples often cited in Anglo-American legal writings are illustrative. German law does not exclude illegally obtained evidence, except if in the judge's opinion it has been obtained by a serious violation of fundamental rights. The nature of the illegality which is alleged to have been committed is thus evaluated. Clemens, *The Exclusionary Rule Under Foreign Law: Germany* (1961) 52 J.Crim.L.C. & P.S. 277. Israeli law condemns the exclusionary rule as useless and unjustified. As a more workable alternative, if an illegal search occurs, the court can charge the responsible individual, convict him immediately, or send him to another judge for trial, in a proceeding roughly comparable to our contempt actions. Cohn, *The Exclusionary Rule Under Foreign Law: Israel* (1961) 62 J.Crim.L.C. & P.S. 282.

**16.** Remember that the "Exclusionary Rule" is totally judge-made; the Fourth Amendment only condemns "unreasonable searches and seizures." Not only is the standard of what is "reasonable" for a policeman to do in making a search different in other countries from the high standard required by some courts here, but *in no country* is a policeman violative of the standard punished by excluding the evidence and freeing the felon.

**17.** Of course I do not exclude other causes for this difference, such as historical tradition, geographical and environmental factors. But surely the factor I am discussing has a powerful effect in aggravating the problem.

preme Court decisions), so long as we remain unique and refuse to formulate a standard of search and seizure found reasonable in England, Canada, and other civilized Western countries, just so long will we have the handgun and homicide problem in its present magnitude. And no laws, existing or proposed, no matter how drafted, will be able to deal with the problem, for the police will not be able effectively to enforce them, as they do in all other civilized parts of the world.

The easier rules of probable cause for search and seizure, reasonable suspicion to make an inquiry stop, and absence of the penalty of excluding the evidence, do not, of course, mean that the police in other countries are busily engaged in harassing citizens. What it does mean, as everyone who has traveled can testify, is that the criminal class do not often carry firearms. Knowing that they can be searched on very little suspicion, and that the weapon, if found, will not be excluded from evidence and that conviction will speedily follow, the criminals are careful to avoid having a firearm in their possession. The police know this, too, i. e., that very few known criminals will have a gun, so the police exercise their authority to search sparingly.

Thus, in other countries the police power to search actually produces fewer firearms in criminal hands, as both sides understand the rules. Here both sides understand the rules all right, but the rules are such that the criminal is tempted to carry a gun, and the policeman is tempted to "bust" the known or suspected criminal frequently. Result: millions of illegal guns, thousands of "illegal" searches, thousands of felons freed, thousands of firearm homicide victims.

Under the United States rule our citizens get the worst of it both ways:

(1) Criminals do carry guns—and use them.

(2) Knowing this, the police engage in far more searches and seizures, some of which are blatantly illegal.

Thus, the American public is harassed more by *both* criminals *and* police than in other countries.

## IV

There are thus two parts to this entirely judge-made problem which we must face and solve. Sequentially, the first is the penchant for many judges to interpret broadly the Fourth Amendment condemnation of "unreasonable" searches and seizures. The second is the application of the exclusionary rule, once an "unreasonable" search has been found. The latter is a rule decreed by the Supreme Court, we judges on this Circuit have no option but to follow it; not being required by the Constitution, being only the method chosen by the Court to enforce a constitutional right, the exclusionary rule can be abolished either by the Court or by Congress.[18]

As to the first part of the problem, every judge should bear in mind that the Constitution only forbids "unreasonable searches and seizures." We on this court can do something about this, within the guidelines of recent Supreme Court decisions. While we obviously cannot permit a search to be justified on the basis of what it produces, otherwise the police would promptly and repeatedly "bust" every known criminal (and some noncriminals) in the District and turn in for prosecution only those found to be carrying weapons or contraband, still that is far from what happened in Montgomery's case. The police had a reason— slight perhaps, but a reason—discussed first among themselves and articulated later, to stop, and then to search, Montgomery. That stop and search cannot be said to have been without a reason, a perfectly valid reason, as the proof showed (the two weapons, ski mask, and bags were not in his car without purpose); this my two colleagues cannot deny. It was, therefore, not an "*un*reasonable" search and seizure within the Fourth Amendment. That search and seizure, and any like it, ought to be upheld by this or any court. That is why I dissent.

18. Chief Justice Burger, dissenting, in *Bivens, supra* at 421, 91 S.Ct. 1999.