**Robert D. KEZIAH, Petitioner,**

v.

**O. M. BOSTIC and the State of North Carolina, Respondents.**

**No. C–C–75–159.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

June 29, 1978.

Jerome Paul, Durham, N. C., and Michael A. Sheely, Charlotte, N. C., for petitioner.

Richard N. League, Asst. Atty. Gen., Dept. of Justice, Raleigh, N. C., for respondents.

## MEMORANDUM OF DECISION AND ORDER

McMILLAN, District Judge.

Robert D. Keziah seeks habeas corpus relief from a two-year prison sentence imposed pursuant to his conviction in Union County Superior Court on a charge of assaulting a highway patrolman. Petitioner alleges that the fracas with the officer arose out of an illegal search and arrest; that he had a right to resist the attempted arrest; and that a conviction in the circumstances violates his constitutional rights. Though petitioner was in custody at the time he filed his application, he was subsequently released on August 19, 1976. The petition is not moot, however, because of the possibility of collateral consequences which may survive the sentence. *Sibron v. New York*, 392 U.S. 40, 50–58, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

At about 3 A.M. on April 27, 1974, a highway patrolman driving along a public highway in Union County met petitioner coming out of a private driveway onto the highway. The patrolman observed petitioner in his rear view mirror for a few seconds, stopped his car and turned around to follow petitioner's vehicle. He observed petitioner drive about one hundred and fifty feet and then turn into another private drive. The patrolman followed him into the drive; he did not at any time lose sight of petitioner's car. When the patrolman turned into the drive, petitioner stopped and backed his car to within a few feet of the patrol car. Both petitioner and the patrolman got out of their cars and approached each other. The patrolman asked to see petitioner's driver's license, but petitioner refused to display it, saying that he did not have to show his license on his own property. Petitioner also refused to tell the officer his name. The patrolman then announced that petitioner was under arrest for failure to display his license. The officer's testimony, as recounted in the record on petitioner's appeal, is as follows:

"I then placed him under arrest. I told him to come have a seat in my vehicle, my patrol car. I took him by his right arm. He moved away from his car and swung up with his right arm and caught me in the side. He struck me. He knocked me away from him to some degree.

"At the time the scuffle occurred, I felt some pain as he first hit me. After he struck me with his elbow, I tried to grab ahold of the subject, and a scuffle occurred. At one time during the scuffle, he had one arm around my neck. I got free from his shoulder. He just about pulled me completely off the ground. I was bent over his back as he was bending over.

"At this time, I struck the subject to free myself. I struck him with a blackjack. . . . I struck him just once. After striking him, he pulled me further over his shoulder. He got hold of both hands. The blackjack got into my left hand during the scuffle. He got hold of the blackjack and took it away from me.

Then, I pulled my pistol on Mr. Keziah. I got myself free from him and told him to return the blackjack. I pointed the pistol at him. He still had my blackjack at that time in his right hand. He finally gave it to me."

Record on Appeal, pp. 11–12. The officer then returned to his car to summon help, but when he did so petitioner ran back to his own car and drove away.

The patrolman admitted that he had no reason to believe petitioner had broken any law or was about to break any law when he observed him and followed him into the private driveway. He confessed that he had not observed petitioner driving suspiciously or in any improper manner. At the time he passed petitioner he was returning from the scene of an automobile accident; he was not searching for petitioner's car or any vehicle similar to it. The officer did state in a vague way that he had some suspicions about an individual who lived in the general area where he stopped petitioner, but he was not searching for this individual at the time he stopped petitioner. He stated at trial that as soon as petitioner stepped out of his car he knew that petitioner was not the individual in question.

The basis of petitioner's claim is that he was unconstitutionally stopped in the first instance and that the patrolman therefore had no authority to demand his license or to arrest him for refusing to display it.

 There is no doubt that the officer's stop and demand was a "seizure" within the meaning of the Fourth Amendment. "It must be recognized that whenever the police officer accosts an individual and restrains his freedom to walk away, he has 'seized' the person." *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968); *see generally* Note, "Automobile License Checks and the Fourth Amendment," 60 *Va.L.Rev.* 666 (1974). The fact that petitioner stopped his car when followed into the driveway and backed up and got out to approach the patrolman does not make the confrontation voluntary. Petitioner could only assume that when he was followed into the driveway the officer meant to accost him for some purpose.

 Was the patrolman's stop and demand "unreasonable" within the meaning of the Fourth Amendment? Under N.C. G.S. § 20–183(a) patrolmen are authorized ". . . to stop any motor vehicle *on the highways of the State* for the purpose of determining whether the same is being operated in violation of any of the provisions of [the Motor Vehicle Act of 1937]." (Emphasis added.) Stops for license and registration checks do not rise to the level of "arrests," but they "will typically be inconvenient and, depending on the personalities and circumstances, may well be embarrassing, perplexing or even fraught with anxiety. A permit-inspection stop is less of an interference than a full search, but it has qualities of intrusiveness that cannot be gainsaid." *United States v. Montgomery*, 182 U.S.App.D.C. 426, 431, 561 F.2d 875, 880 (1977). The state's power to enforce its vehicle safety and registration laws through some system of vehicle stops is conceded, but the Fourth Amendment also requires some accommodation of the individual interest in being left alone. Vehicle license checks must not be used as pretexts for harassment or for baseless investigations.

The North Carolina Supreme Court has upheld the constitutionality of § 20–183(a) in *State v. Allen*, 282 N.C. 503, 510–11, 194 S.E.2d 9 (1973). The court in *Allen* noted that once a stop had been made under § 20–183(a), an officer could not engage in an indiscriminate search of the vehicle or an arrest of its occupants without probable cause, but the court apparently saw no need to place any limitation on the officer's prior decision to require a vehicle to stop. In other words, the court saw no constitutional problems in vesting complete discretion in the individual officer to decide which cars to stop and which to let pass.

The United States Supreme Court has been more cautious; while carefully avoiding any statement that could be construed as a constitutional prohibition of limited vehicle stops for purposes of enforcing

license and registration laws, the Court has been equally careful *not* to delineate the circumstances under which such stops *would* be considered constitutional. See, *e. g., United States v. Martinez-Fuerte,* 428 U.S. 543, 560 n. 14, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni-Ponce,* 422 U.S. 873, 883 n. 8, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

It is undisputed that the patrolman's stop of petitioner can be justified only as an inspection and license check. There was no basis for a stop under the "articulable suspicion" rationale of *Terry.* Yet the actions of the patrolman in this case hardly conform to a typical routine stop along the highway to check a driver's license. At the time of the incident the officer was not engaged in any patrol of the highway for purposes of observing traffic or making random license checks. The mere fact that his decision to stop petitioner was spontaneous does not make his stop part of any program of random checks. *United States v. Montgomery, supra,* 182 U.S.App.D.C. at 435, 561 F.2d at 884. When petitioner turned into the highway, the patrolman was going in the opposite direction. He could observe petitioner only by watching him in his mirror. To follow petitioner he was required to stop his car, turn around and go back in the direction from which he had come. He did not stop petitioner "on a public highway" or while petitioner was still operating a vehicle (see § 20–183(a)), but instead followed him into a *private driveway.* The overwhelming inference is that the purpose of the stop was not to conduct a routine license check but to follow up on some unarticulated hunch.

The stop was no less intrusive because in fact all the officer did was demand to see petitioner's license. The degree of intrusiveness depends not only on objective factors but also on the subjective reaction the stop is likely to produce. Petitioner was followed into his own private drive at 3:00 A.M. by a police vehicle which just moments before had met him going in the opposite direction. In the circumstances it would have been perfectly natural to assume that he was about to be subjected to a search or inquiry for some purpose other than a routine license check. The incident was plainly a situation "fraught with anxiety." *United States v. Montgomery, supra.*

The patrolman's actions illustrate the danger inherent in blanket approval of all vehicle stops where the nominal purpose is to check registration or licenses. To permit stops in the unrestrained discretion of police officers is to allow such stops to be used as pretexts for investigations and to sanction stops which could not have been justified under the standards set out in *Terry.* A limitation on the *scope* of a license check is not enough; the very stop itself may constitute an unreasonable intrusion. For this reason the decision in *State v. Allen* is not sufficiently sensitive to the need to accommodate the state's interest in enforcing its vehicle laws to the individual's right to be free from unreasonable interference with his travel on the highways.

■ I conclude that the officer's action in invading petitioner's private driveway, under these circumstances, was unlawful as an unreasonable search and seizure under the Fourth Amendment.

It is not material that petitioner's refusal to display his license constituted an independent violation of N.C.G.S. § 20–29. Since the initial stop and demand themselves were illegal, the officer could not invoke § 20–29 to bootstrap himself into a legal arrest.

This does not end the matter, however, since petitioner was arrested after the incident and finally convicted *not* for refusing to display his license in violation of § 20–29 but for *assaulting an officer* while the officer was attempting to discharge a duty of his office. N.C.G.S. § 14–33(b)(4). On the facts of this case there is little difference between the offense under § 14–33(b)(4) and the separate offense of resisting arrest. N.C.G.S. § 14–223; *see State v. Keziah,* 24 N.C.App. 298, 300, 210 S.E.2d 436 (1974).

■ The right to resist an unlawful arrest is recognized in North Carolina, but only such force may be used as reasonably

appears to be necessary to prevent the unlawful restraint. If the arrest is authorized by statute or by legal process facially adequate, the arrest does not give rise to a right to resist. *State v. Mobley,* 240 N.C. 476, 83 S.E.2d 100 (1954); *State v. Jefferies,* 17 N.C.App. 195, 193 S.E.2d 388 (1972); *Wright v. Bailey,* 544 F.2d 737 (4th Cir. 1976).

The statute under which the patrolman claimed to act had been given a broad construction at the time of petitioner's arrest. *State v. Allen, supra; see also United States v. Kelley,* 462 F.2d 372 (4th Cir. 1972). Not only had the statute been declared facially constitutional, it had been endorsed in such terms as might fairly have been thought to imply that there were no dangers of unconstitutional application. The *Allen* decision stood for the proposition that a vehicle stop under § 20–183(a) which did not go beyond a simple license or registration check was such a minimal intrusion that no Fourth Amendment interests were implicated. The patrolman who stopped petitioner could reasonably have assumed that since he had seen petitioner operating a vehicle on a public highway, it did not matter that he was not able to reach and stop the vehicle until it had turned off the highway. This aspect of the case was not even thought worthy of comment by the North Carolina Court of Appeals. *State v. Keziah, supra.* Thus, while petitioner would have had a meritorious defense to any prosecution based on failure to display his license, he was not entitled to invoke self-help against what was, at the time, an arguably lawful arrest. *Cf. Wright v. Bailey, supra.*

Since petitioner's conviction *for assaulting a highway patrolman* can survive despite the finding that the officer's initial stop and demand were illegal, the petition will be denied.

IT IS THEREFORE ORDERED that the application for a writ of habeas corpus is denied and the petition is dismissed.

Petitioner is advised that he may appeal from this *final* order by forwarding a written notice of appeal to the Clerk of United States District Court, Post Office Box 1266, Charlotte, North Carolina 28231. Said *written* notice of appeal must be *received* by the Clerk within thirty (30) days from the date of entry of this final order. The court declines to issue a certificate of probable cause.

The Clerk is requested to mail copies of this order to the petitioner and to the Attorney General of North Carolina.