**UNITED STATES of America, Plaintiff,**

v.

**Michael Lee TURNER, Defendant.**

**No. 79–CR–108.**

United States District Court,
E. D. Wisconsin.

Aug. 8, 1979.

Stephen E. Kravit, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff.

Robert J. Lerner, Perry, First, Reiher & Lerne, Milwaukee, Wis., for defendant.

## MEMORANDUM AND ORDER

WARREN, District Judge.

On June 22, 1979, the Port Washington Bank, Saukville Branch, Saukville, Wisconsin was robbed. Needless to say, this occurrence caused quite a stir in the small town. Shortly after the robbery occurred, David Hansen, who was working on an automobile at Albinger Pontiac in Saukville, took the automobile he was repairing for a test drive. Hansen left the garage and eventually came to the intersection of County Highway W and East Sauk Road. At the intersection, Hansen saw a blue station wagon with a person seated behind the wheel parked on East Sauk Road facing east. Hansen passed the blue automobile and returned to the garage.

After arriving back to the garage, Hansen, who had learned about the robbery when a police officer had borrowed a bolt cutter from the garage, related to Albinger that he saw a blue station wagon parked on East Sauk Road that was "suspicious" and "goofy-looking." Hansen also recalled that the car was in the traveled portion of the highway. Upon hearing this, Albinger, Chief of the Volunteer Fire Department and owner of Albinger Pontiac, decided to report the blue station wagon to the police.

Albinger called the Ozaukee County Sheriffs Department and spoke with a Deputy Mark Gierach. Albinger told Gierach about the "goofy-looking guy" sitting in a blue station wagon parked at East Sauk Road and County Highway W. This message was conveyed to Sargeant Gary Langlais who was investigating the bank robbery at the time and was at the scene. Sargeant Langlais was dispatched to investigate and proceeded south on County Highway W, and as he neared East Sauk Road, he saw a blue station wagon enter the traveled portion of County Highway W heading north by either turning right from East Sauk Road or by entering from the shoulder.

Langlais observed that there were no passengers in the blue wagon other than the driver, who had a bushy beard and bushy hair. Sargeant Langlais made a U-turn so that he was proceeding north on county Highway W following the blue station wagon. Although the speed limit on County Highway W was 55 m. p. h., when Langlais first saw the wagon, it was doing 20 m. p. h., and while he was following the automobile, it never exceeded 35 m. p. h. Langlais noted that the wagon bore an Indiana license plate and that it was traveling on a road almost exclusively used by locals.

Besides the slow speed of the automobile, Langlais noted that it was being driven very cautiously and that the driver kept peering into the rear-view mirror. Langlais was also cognizant of the area near the intersection of County Highway W and East Sauk Road which is an open area with the nearest house being approximately one-quarter of a mile from the intersection.

Langlais eventually stopped the blue station wagon and approached the automobile on foot. The driver, defendant Michael Lee Turner, was asked to produce a driver's license. He did not have one and he produced other identification. Turner stated that he did not have his license with him, but that he had an Indiana driver's license. Langlais called in to the dispatcher to have the license verified and then asked Turner whether he owned the automobile. Turner said that it was not his, but that he had borrowed it from his girlfriend's girlfriend. Turner could give Langlais neither the name of the girlfriend or the lender. As he had approached the car, Langlais noticed that it was messy and littered with candy bars, wrappers and snacks. Eventually, after Turner agreed to go to the bank, and

there, after observation, witnesses stated that Turner was not one of the robbers, Turner was arrested for operating a motor vehicle without the owner's consent.

Turner told Langlais that the permission slip to operate the car was in its glove compartment. With Turner's permission, Langlais entered the blue station wagon to look for the papers and upon entering, he saw handcuff keys laying on the floor that would fit the handcuffs with which employees and patrons of the bank were shackled. Langlais took the keys with him and these, in fact, worked the handcuffs.

Langlais took Turner to his office, and on the way read him his constitutional rights as provided by the Wisconsin Department of Justice (*Miranda* warnings). The card read to Turner provides:

> You have the right to remain silent.
>
> Anything you say can and will be used against you in a court of law.
>
> You have the right to consult with a lawyer before questioning and to have a lawyer present with you during questioning.
>
> If you cannot afford to hire a lawyer, one will be appointed to represent you at public expense before or during any questioning, if you so wish.
>
> If you decide to answer questions now without a lawyer present, you have the right to stop the questioning and remain silent at any time you wish, and the right to ask for and have a lawyer at any time you wish, including during the questioning.
>
> Do you understand each of these rights?
>
> Realizing that you have these rights, do you wish to consult with an attorney?
>
> Realizing that you have these rights, do you wish to answer questions or make a statement now without an attorney present?

(Plaintiff's Exhibit 2).

Turner did not waive his right at this time and he was not asked any questions. At the sheriff's office, Turner was booked and placed in a detention cell. Later he was brought to Langlais' desk in the squad room for questioning by Federal Bureau of Investigation Agents. The arrest had occurred at about 12:00 noon and at 1:34 P.M., Turner signed a waiver of rights similar to that read to him by Sargeant Langlais. (Plaintiff's Exhibit 3). The waiver indicated that Turner would answer questions without a lawyer being present. From 1:35 P.M. to 2:05 P.M., Turner was asked questions concerning the bank robbery, which questions were answered. Agent Brown then felt a reporter would be helpful and one was brought in to record Turner's answers.

At 2:22 P.M., shortly before Turner answered questions recorded by a reporter, Turner signed another waiver of his *Miranda* rights. (Plaintiff's Exhibit 4). Before answering any questions, Turner indicated that if the authorities were going to charge him with a state charge, he was not going to answer any questions. No promises were made to Turner and he answered the questions posed by the F.B.I. agents.

Finally, after the interrogation of Turner, a search warrant permitting the authorities to search the 1979 blue Ford station wagon that Turner had been driving was obtained from Judge Walter J. Swietlik.

Defendant seeks to suppress the evidence obtained by the search of the blue station wagon and the statements made by defendant to the police officers and F.B.I. agents. Defendant claims that the original stop was unlawful and that the statements made by him and all other information obtained from defendant must be suppressed. Even if the stop was not unlawful, defendant argues that his statement must be suppressed because defendant did not waive his constitutional rights.

■ The first issue the Court must determine is whether the stop was unlawful. In *United States v. Montgomery,* 182 U.S.App. D.C. 426, 430, 561 F.2d 875, 879 (1977), the court held that for an officer to stop a vehicle to question the driver he must have "specific articulable facts which, taken together with rational inferences from those facts, reasonably warrant suspicion of criminal conduct . . . ." This opinion con-

forms to the recent decision of the Supreme Court in *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). There the court held that random spot checks of automobiles to determine whether the driver was licensed and whether the automobile was registered are unreasonable under the fourth amendment of the United States Constitution. The court held that to stop a vehicle an officer must have "at least [an] articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law . . .." *Id.* 440 U.S. at 661, 99 S.Ct. at 1401. *Accord, United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

Based upon the foregoing law, this Court must determine whether the facts known to Sargeant Langlais "reasonably warrant[ed] suspicion of criminal conduct . . . ." *United States v. Montgomery,* 182 U.S.App. D.C. at 430, 561 F.2d at 879. In his testimony at the suppression hearing, Sargeant Langlais articulated his reasons for stopping the blue station wagon. He had received a suspicious vehicle call from his dispatcher. The suspicious automobile was reported to Langlais and also seen by him at a point within one mile of the bank robbery. In observing the automobile and its driver, Langlais noted that the slovenly appearance and dress of the driver did not match the 1979 automobile and that the Indiana license was out of place on County Highway W, which was a road used almost exclusively by local citizens. Finally, Langlais indicated he had observed that the station wagon was being driven in a very cautious manner.

Although not expressed by Langlais as a reason used by him, there was a further unusual thing about the blue station wagon. It had remained in a deserted area for a considerable length of time. When observed by Langlais, the automobile was in the same area where it had been reported by a citizen. Furthermore, there was a proximity in time between the time of the robbery, which was at 10:55 A.M., and the time of the call to Langlais at 11:17 A.M.

When taken together, all of the factors observed by Langlais warranted him in stopping Mr. Turner. Based upon the facts observed by Sargeant Langlais, he had a "reasonable suspicion" of criminal conduct. In *United States v. Montgomery, supra,* the court held that a "hunch" was not an articulable and reasonable suspicion. The police in *Montgomery* had merely observed a vehicle drive around the same block twice, and the court held this was not enough to warrant a stop. It is not enough to observe an automobile driving slowly, for example, to warrant a stop. *See, e. g., United States v. Shipp,* 566 F.2d 528 (5th Cir. 1978). It is also not sufficient to warrant a stop when an officer observes the driver's nervousness and excited demeanor. *United States v. Ballard,* 573 F.2d 913 (5th Cir. 1978). Furthermore, in this Court's opinion, proximity to a crime is not in and of itself a sufficient reason to justify a stop, although courts have found that it is a relevant factor in determining the validity of a stop. *United States v. Wright,* 565 F.2d 486 (8th Cir. 1977); *United States v. Hall,* 557 F.2d 1114 (5th Cir. 1977); *United States v. Purry,* 178 U.S.App.D.C. 139, 545 F.2d 217 (1976).

Taken alone, no one of the factors observed by Langlais would have been enough to justify the stop. In this case, however, Langlais observed numerous facts which lead him to a reasonable suspicion of criminal activity. In summary, the Court must find Langlais' stop of Turner to be lawful.

Turner next argues that all of the evidence obtained as a direct result of the stop must be suppressed. It is defendant's argument that when a stop is unlawful, all of the evidence obtained as a direct result is inadmissible, as are the defendant's statement. Since the Court has found that the stop was not unlawful, Turner's motion to suppress the evidence discovered on the basis of the alleged unlawful stop must be denied.

■ Turner's final argument is that the statements made by him to the F.B.I. agents must be suppressed because the offi-

cers did not respect Turner's wish not to be interrogated. Turner's motion to suppress the statements is based upon his statement that "If it's going to be a State charge, I ain't going to say shit." In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the court held that a defendant has a constitutional right to remain mute and have a lawyer present "which [rights among others] he may waive . . . provided the waiver is made voluntarily, knowingly, and intelligently." *Id.* at 444, 86 S.Ct. at 1612. The court went on to say, however, that even if defendant did waive his right to remain silent, "if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." *Id.* at 444–445, 86 S.Ct. at 1612. The issue presented by Turner's motion is whether Turner's statement that he would not say anything "if it's going to be a State charge" was an indication that he did not wish to answer questions. The Court thinks not.

There can be no question but that Turner was adequately advised of his constitutional rights. He was read his rights on three occasions and he signed two written waiver of rights forms. Clearly the agents complied with the letter and spirit of *Miranda v. Arizona, supra.* Furthermore, there is no evidence of overbearing by the police officers nor any evidence of promises having been made that state charges would not be brought. Turner was fully aware of his rights and, furthermore, he was aware that he was being held for operating a vehicle without the owner's consent and that he was suspected of being involved in the bank robbery.

The real question here is the voluntariness of the statements made. Considering all of the factors, including the fact that Turner was repeatedly advised of his right to stand mute, it is clear to this Court that Turner waived those rights. Furthermore, since no promises were made and since Turner was fully appraised of his rights, the statements made were fully voluntary. His statement about the state charge was not, in this Court's opinion, an indication that he wanted the interrogation to stop. He could

have made such a statement, but simply did not.

In light of the foregoing, defendant's motion to suppress must be and hereby is denied.